FORTUNA ENTERPRISES, L.P. d/b/a
The Los Angeles Airport Hilton Hotel
and Towers, a Delaware Limited Part-
nership, Plaintiff,

v.

The CITY OF LOS ANGELES,
et al., Defendants.

No. CV 08–4373 SVW (MANx).

United States District Court,
C.D. California.

Oct. 6, 2008.

Michael J. Finnegan, Nathan M. Spatz, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, CA, for Plaintiff.

Adena Michelle Hadar, Laurie Rittenberg, Los Angeles City Attorney Office, John A. Carvalho, Office of the City Attorney, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [16] [JS–6]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Defendants move to dismiss the Verified Petition for Alternative Writ of Mandate and Peremptory Writ of Mandate; Complaint for Declaratory Judgment and Injunctive Relief ("Compliant") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue that the Airport Hospitality Enhancement Zone Ordinance ("Ordinance") (1) is not preempted by federal law under either *Garmon* or *Machinists* preemption doctrines, and (2) does not violate the equal protection guarantees of the United States and/or California Constitutions. For the reasons that follow, Defendants' Motion to Dismiss is GRANTED.

## II. FACTS

On June 30, 2008, Fortuna Enterprises, L.P., d/b/a The Los Angeles Airport Hilton Hotel and Towers ("Plaintiff") filed this lawsuit to challenge the validity of the Ordinance. The Ordinance was passed by the Los Angeles City Council on February 21, 2007. Plaintiff filed this lawsuit on June 20, 2008, the day before the Ordinance was scheduled to go into effect.

The stated purpose of the Ordinance is to promote the economic vitality of the Century Boulevard Corridor ("Corridor") near the Los Angeles Airport ("LAX") by "designating it as an Airport Hospitality Enhancement Zone ("Zone") within which the City will target new City resources, investments and benefits." (Compl., Ex. A ("Ordinance"), at 1.) The Zone's proposed enhancements include (1) a conference center near the airport, (2) a workforce training program for hospitality workers, (3) a grant of $50,000 to develop a marketing program for the Corridor, (4) reduction in business taxes for retail and restaurant business opening new locations in the Zone, (5) $1 million for street improvements and landscaping, (6) a remote check-in system at the airport for hotels in the Zone, (7) a study to determine the feasibility of extending subsidized electric rates to the Zone, and (8) a recycling and waste diversion program to be developed by the Bureau of Sanitation. (*Id.* at 3–5.)

In return for the City providing these benefits, hotels in the Zone with fifty or more guest rooms, are required to pay their employees a "living wage." (*Id.* at 1.) The hotels must pay $9.39 per hour with health benefits, or $10.64 per hour without health benefits. (*Id.* at 5.) The rates are to be adjusted annually in accordance with the Consumer Price Index. (*Id.*) Additionally, the hotels must allow their employees to take twelve compensated, and ten uncompensated, days off per year. (*Id.*) The City shall conduct a study after one year to evaluate the effect of the Ordinance on Hotels, customers, and workers in the Zone. (*Id.* at 6.)

The Ordinance provides two exemptions from compliance with its terms. First, a hotel need not comply with the Ordinance if the hotel enters into a "bona fide collec-

tive bargaining agreement" that includes a clear and unambiguous waiver of the terms of the Ordinance. (*Id.* at 8.) Second, a hotel employer can be exempted if it demonstrates to the Controller that compliance with the Ordinance would cause the hotel to (1) reduce its workforce by more than 20%, (2) curtail the hours worked by hotel workers by more than 30%, or (3) go bankrupt or shut down. (*Id.*) If these conditions are satisfied, the Controller can issue a waiver of the Ordinance for "no more than one year." (*Id.*)

The Ordinance justifies imposition of the living wage on the hotels, by the fact that LAX "is among the world's busiest airports, hosting millions of travelers every year," and the Zone is "situated immediately adjacent to LAX [and] serves as both the welcome mat to the City and the gateway to LAX." (*Id.* at 1.) The Ordinance further explains its purpose:

> The hotels in the Corridor will not only derive significant and unique business benefits from their close proximity to LAX, ... but from the City's designation of the Corridor as an Airport Hospitality Enhancement Zone. These benefits are unique as compared to any other industry in any other region of the City. Accordingly, the City finds that it is appropriate to impose a regulatory requirement to pay a living wage on certain hotels in the Corridor, a requirement that has not been imposed except upon companies with certain types of business relationships with the City. The City ... has an interest in promoting an employment environment that protects government resources and engages in responsible employment practices. In requiring the payment of a higher minimum level of compensation, this article benefits that interest.

> By way of this ordinance, the City seeks to improve and encourage the continuing growth and development of the business community in the Century Boulevard Corridor, while simultaneously improving the welfare of service workers at LAX-area hotels by ensuring that they receive decent compensation for the work they perform.

(*Id.*)

## III. ANALYSIS

### A. Legal Standard

At the motion to dismiss stage, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Daniel v. County of Santa Barbara*, 288 F.3d 375, 380 (9th Cir.2002). "Dismissal can be based on a lack of a cognizable legal theory or absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990). Here, Defendants claim that Plaintiff has not alleged facts sufficient to state a claim that the Ordinance is preempted by federal labor law or that it is unconstitutional. (Mot., at 4.)

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990). However, material that is submitted as part of the complaint may be considered on a motion to dismiss. *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994) *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002). Here, the Ordinance is attached as an exhibit to Plaintiff's Complaint and its terms are uncontested. Since this is a facial challenge to the Ordinance, there is no need for further development of the facts. *See Dyad Constr., Inc. v. City of Portland*, 765 F.Supp. 653, 654 (D.Or.1991) *aff'd, Babler Bros., Inc. v. Roberts*, 995 F.2d 911, 913 (9th Cir.1993) (granting motion to dismiss because preemption of the state labor law was simply

a "legal issue"). Thus, this case is capable of resolution at the motion to dismiss stage.[1]

## B. Preemption

Under federal labor law, two doctrines of preemption have developed to carry out the federal labor policy that Congress created when it passed the National Labor Relations Act ("NLRA"). *Chamber of Commerce of the United States v. Brown,* —— U.S. ——, 128 S.Ct. 2408, 2412, 171 L.Ed.2d 264 (2008). The first is know as *Garmon* preemption, *see San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (quotations omitted). The second is known as *Machinists* preemption, which prohibits states from regulating conduct that Congress intended to be "controlled by the free play of economic forces." *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Plaintiff contends that both doctrines apply here to preempt the Ordinance.

### 1. *Garmon* Preemption

■ Under *Garmon* preemption, the NLRA "preempts state laws that attempt to regulate conduct which is either arguably protected or prohibited by the NLRA." *Dillingham Const. N.A., Inc. v. County of Sonoma,* 190 F.3d 1034, 1041

(9th Cir.1999). A state statute is subject to *Garmon* preemption when the statute's terms regulate matters within the scope of sections 7 or 8 of the NLRA. *Babler,* 995 F.2d at 914. Section 7 of the NLRA protects the rights of employees in collective bargaining, including the right to strike, their right to picket, and their right to join or not join a union. *See* 29 U.S.C. § 157. Section 8 regulates unfair business practices, and generally prohibits employers and labor organizations from interfering with employee rights that are protected under section 7 of the Act. *See id.* § 158. Section 8(a) prohibits unfair conduct by employers, including discrimination between union and non-union employees. *See id.* § 158(a). Section 8(b) prohibits unfair labor practices by labor organizations. *See id.* § 158(b).

As an initial matter, Plaintiff does not identify any specific provision of section 7 or 8 of the NLRA, with which the Ordinance allegedly interferes. For example, Plaintiff does not allege that the NLRA regulates work wages such that the Ordinance would be preempted on that basis. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (finding state law establishing minimum welfare benefit plans not preempted because "[t]here is no claim here that Massachusetts has sought to regulate or prohibit any conduct subject to the regulatory jurisdiction of the NLRB, since the Act is silent as to the substantive provisions of welfare-benefit plans"); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 22 n. 16, 107 S.Ct. 2211,

---

1. The Court finds that Plaintiff has standing to challenge the Ordinance given that Plaintiff will suffer injury in fact by having to pay higher wages, and invalidation of the Ordinance would redress Plaintiff's injury. *See Viceroy Gold Corp. v. Aubry,* 75 F.3d 482, 488 (9th Cir.1996) (noting the three requirements for standing: (1) threatened or actual distinct

and palpable injury, (2) fairly traceable to the challenged conduct, and (3) substantial likelihood that the requested relief would redress the injury). Moreover, the Court finds that failure to join all employees affected by the Ordinance, does not violate Rule 19. *See* Fed.R.Civ.P. 19(b) (noting that suit can proceed when joinder is not feasible).

96 L.Ed.2d 1 (1987) (finding that *Garmon* preemption did not apply because the state statute did not purport to regulate any conduct regulated by the NLRA).

Instead, Plaintiff alleges that the Ordinance "improperly encourages the collective bargaining process," given that it allows union employers to avoid the minimum wage standards set by the Ordinance by entering into a collective bargaining agreement or through a hardship waiver from the Controller. (Opp'n, at 11.) For support of this argument, Plaintiff relies heavily on *Bechtel Construction, Inc. v. United Brotherhood of Carpenters & Joiners of America*, 812 F.2d 1220 (9th Cir.1987).

In *Bechtel*, the plaintiff challenged a state law that set the minimum wage rate for apprentice tradepersons. *Id.* at 1225. The dispute arose because the plaintiff, a construction company, obtained approval from the union bargaining representative to reduce wages for all tradespeople pursuant to the General Presidents Project Maintenance Agreement ("GPPMA"). *Id.* at 1221. Individual apprentices filed suit to recover lost wages, arguing that the GPPMA did not alter their wage rate because the apprentice wage rate was set by a separate agreement called the Apprenticeship Agreement. *Id.* at 1221–22. The Apprenticeship Agreement included a wage rate schedule that was set by the California Division of Apprenticeship Standards. *Id.* at 1222. Thus, notwithstanding the fact the majority bargaining representative had taken action to negotiate a different agreement on behalf of all tradespeople, any change in apprentice wage rates had to be approved by the California Division of Apprenticeship Standards. *See id.*

Applying *Garmon* preemption, the Ninth Circuit found that the actions of the California Division of Labor Standards Enforcement,[2] in "attempting to set aside the wage rates negotiated by the apprentices' majority bargaining representative," infringed upon the workers' rights under section 7 of the NLRA to "join together and designate representatives to negotiate the terms and conditions of employment." *Id.* at 1225. The court said that "[t]he effect of the policy ... authorizing a bargaining representative to negotiate wage levels for apprentices lower than the Standards only if the Division of Apprenticeship Standards is involved, is to mandate state interference in the collective bargaining process." *Id.* at 1226.

██ Here, the Ordinance is distinguishable from the state law invalidated in *Bechtel* because there is no governmental agency whose approval is required in order to ratify the terms of a collective bargaining agreement entered into between a hotel and a union. The Ordinance simply sets the rate of the "living wage" and then allows the hotels to enter into a collective bargaining agreement if they wish. There are no restrictions on the terms of the collective bargaining agreement, and no agency approval required. The Ordinance allows a collective bargaining agreement to set wages at a rate higher or lower than the wage set by the Ordinance, depending of course, on the relative bargaining power of the respective sides. In short, the reasoning of *Bechtel* does not apply here because there is no mandated state interference in the collective bargaining process.

Indeed, subsequent Ninth Circuit decisions have recognized that the decisive factor in *Bechtel* was the intrusive role that the government agency played in the

---

**2.** The Division of Labor Standards Enforcement was the state agency that accepted jurisdiction to adjudicate the apprentices' claims for lost wages. *Id.*

collective bargaining process. In *Dillingham*, the Ninth Circuit rejected the plaintiff's argument that *Bechtel* commanded a finding of *Garmon* preemption. 190 F.3d at 1041. The court said:

> The right to bargain collectively [in *Bechtel*] was ... affected by the apprentice wage standards because the wage standards were not true legal minimums and because the state became a second bargaining agent. In contrast, the apprentice prevailing wage law establishes true minimum standards for apprenticeship programs, ... and does not inject the state into the collective bargaining process.

*Id.* Similarly, in *Associated Builders & Contractors of Southern California v. Nunn*, the Ninth Circuit said that the "holding [in *Bechtel*] turned on the fact that the state impermissibly interfered with the collective bargaining process, by becoming a participant." 356 F.3d 979, 988 (9th Cir.2004).[3]

Thus, Plaintiff's claim based on *Garmon* preemption fails because the Ordinance does not interfere with conduct that is arguably protected by the NLRA. The Ordinance places no substantive restrictions on the terms of the collective bargaining agreement that the hotels choose, or choose not, to enter into. Unlike *Bechtel*, there is no governmental approval required for a collective bargaining agreement negotiated and entered into under the terms of the Ordinance. Thus, the Ordinance is not subject to *Garmon* pre-

emption, and Plaintiff's claim on this ground is dismissed.

### 2. *Machinists* Preemption

■ "Under the *Machinists* preemption doctrine, the NLRA preempts state laws and state causes of action that regulate activity Congress intended to leave unregulated." *Dillingham*, 190 F.3d at 1038. *Machinists* preemption is based on the understanding that, in enacting the NLRA, "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Machinists*, 427 U.S. at 140 n. 4, 96 S.Ct. 2548. The general idea is that "[w]hat Congress left unregulated is as important as the regulations that it imposed." *Golden State Transit v. City of Los Angeles*, 493 U.S. 103, 110, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989).

As an initial matter, Plaintiff does not dispute that state minimum wage laws are not subject to *Machinists* preemption. (Opp'n, at 5.) The general principle that states can pass minimum employment standards without running afoul of federal labor law was established in *Metropolitan Life*. In *Metropolitan Life*, the Supreme Court considered whether federal labor law preempted a state law that required specific minimum mental-health care benefits to be provided under all general insurance policies, accident or sickness insurance policies, or employee healthcare plans. 471 U.S. at 727, 105 S.Ct. 2380. The plaintiff argued that the state law was

---

**3.** Plaintiff also relies on *Associated Builders & Contractors, Golden Gate Chapter Inc. v. Baca*, 769 F.Supp. 1537 (N.D.Cal.1991). It should be noted, however, that *Baca* was analyzed under the framework of *Machinists* preemption, not *Garmon* preemption. *Id.* at 1542 n. 5. Nonetheless, to the extent it is relevant here, the case involved a "prevailing wage" statute, which set the wage by reference to established collective bargaining agreements within the locality in which the work was to

be performed. *Id.* at 1544. The court found that the effect of the statute was to impose on non-union employers "wage rates determined by the collective bargaining of others[, which] involves both the state and third parties in the collective bargaining process." *Id.* In effect, certain unions could "set the prevailing wages for the state," because the non-union employers would have to pay the same collective bargaining rate. *Id.* at 1545. Such is not the case here.

preempted because "welfare benefits are a mandatory subject of bargaining" under federal labor law, and the state law would affect the terms of subsequent collective bargaining agreements between employers and employees. *Id.* at 751–52, 105 S.Ct. 2380.

The Court examined the purpose of the NLRA, which was to "remedy 'the inequality of bargaining power between employees who do not possess the full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.'" *Id.* at 753, 105 S.Ct. 2380 (quoting 29 U.S.C. § 151). The ultimate goal of the Act was to resolve the problem of "depressed wage rates" and "the widening gap between wages and profits." *Id.* at 754, 105 S.Ct. 2380 (quotations omitted). In light of this purpose, the Court found that the "evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment." *Id.* The Court held:

> No incompatibility exists ... between federal rules designed to restore the equality of bargaining power, and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.

*Id.* at 754–55, 105 S.Ct. 2380. Thus, the Court said that state minimum labor standards are not preempted because they "affect union and nonunion employees equally, and neither encourage nor discourage the collective-bargaining processes." *Id.* at 755, 105 S.Ct. 2380.

Going on to examine the legislative history of the NLRA, the Court further noted that there was no indication that "Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unregulated in any way to the processes of bargaining or self-organization." *Id.* at 756, 105 S.Ct. 2380. States have broad authority under the police power to pass employment regulations and to protect the workers in the state. *Id.* "Federal labor law in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." *Id.* In conclusion, the Court found that the state law was not preempted because it did not "limit the rights of self-organization or collective bargaining." *Id.* at 758, 105 S.Ct. 2380.

Just two years later, the Supreme Court again considered whether *Machinists* preemption invalidated a state minimum labor standard. In *Fort Halifax*, a Maine statute required employers to provide a one-time severance payment to employees if a production facility closed in the state. 482 U.S. at 4, 107 S.Ct. 2211. Significantly, an employer did not have to comply with the statute if the employee was covered by an "express contract providing for severance pay." *Id.* at 4 n. 1, 107 S.Ct. 2211. The plaintiff argued that the state statute was preempted because the law "intrude[d] on the bargaining activities of the parties because the prospect of a statutory obligation undercut[ ] an employer's ability to withstand a union's demand for severance pay." *Id.* at 20, 107 S.Ct. 2211. In light of the Court's earlier holding in *Metropolitan Life*, however, the Court said that the argument that a "[s]tate's establishment of minimum substantive labor standards undercuts collective bargaining ... [had been] considered and rejected." *Id.* The Court noted that "[b]oth employers and employees come to the bargaining table with rights under state law that form a backdrop for their negotiations." *Id.* at 21, 107 S.Ct. 2211 (quotations omitted). "Thus, the mere fact that a state statute

pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption." *Id.*

The Court rejected the argument that the case was distinguishable from *Metropolitan Life* because the statute only applied in the absence of an agreement covering severance pay. *Id.* at 22, 107 S.Ct. 2211. The Court found that "[t]he fact that the parties are free to devise their own severance pay arrangements ... strengthens the case that the statute works no intrusion on collective bargaining." *Id.* Thus, the Maine statute was a "valid and unexceptional exercise of the State's police power." *Id.* (quotations omitted).

Plaintiff takes note of the Supreme Court decisions in *Metropolitan Life* and *Fort Halifax*, but argues that this case is different because this case is not an "unexceptional exercise" of the state's police power. (Opp'n, at 10.) Rather, Plaintiff contends that the Ordinance affects the bargaining process in a much more invasive and detailed fashion than the laws of general application approved in *Metropolitan Life* and *Fort Halifax*. (*Id.*) In support of this position, Plaintiff relies on the Ninth Circuit decision in *Chamber of Commerce of the United States v. Bragdon*, 64 F.3d 497 (9th Cir.1995).

In *Bragdon*, the Ninth Circuit found that *Machinists* preemption applied to invalidate a Contra Costa county ordinance that required construction employers to pay "prevailing wages" on certain private industrial construction projects costing over $500,000.[4] *Id.* at 498. The county ordinance required the employer to agree to pay the prevailing wage before the county would issue a building permit for the project. *Id.* at 499. The prevailing wage was determined "by reference to established collective-bargaining agreements within the locality in which the public work [was] to be performed." *Id.*

Applying the *Machinists* preemption doctrine, the Ninth Circuit took a broad view and said that "[t]he essential question in this case is whether the Ordinance is incompatible with the goals of the NLRA."[5] *Id.* at 501. The court noted that the Supreme Court has allowed "minimal substantive requirements" on contract terms in *Metropolitan Life* and *Fort Halifax*, but the court expressed concern that more onerous substantive requirements could affect the collective bargaining process:

> Viewed in the extreme, the substantive requirements could be so restrictive as to virtually dictate the results of the contract. The objective of allowing the bargaining process to be controlled by the free-play of economic forces can be frustrated by the imposition of substantive requirements ... The question then becomes the extent of the substantive requirements that the state may impose on the bargaining process.[6]

*Id.*

Applying this standard to the facts, the Ninth Circuit found that the ordinance did

---

**4.** *Bragdon* is the appeal to the Ninth Circuit from the district court's ruling in *Baca*, discussed *supra* note 3.

**5.** The court formulated the question as such after examining *Metropolitan Life*, which said that "[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act." 471 U.S. at 756–57, 105 S.Ct. 2380.

**6.** In an attempt to defeat Defendants' Motion to Dismiss, Plaintiff asks the Court to allow it to submit expert testimony to determine the extent that the Ordinance interferes with the bargaining process. (Opp'n, at 10.) As framed in *Bragdon*, the question of the "extent of the substantive requirements that the state may impose on the bargaining process" is a question of law, not of fact. Thus, Plaintiff's request is denied.

"much more than the type of state regulation that has previously been held not preempted." *Id.* at 501. The court noted that the prevailing wage is developed pursuant to the regulations promulgated by the Director of the Department of Industrial Relations, which uses a formula to average the wages and benefits for each craft pursuant to collective-bargaining agreements applicable in each labor market. *Id.* at 502. The prevailing wage imposed on the private employers was "one derived from the combined collective bargaining of third parties" and "not the result of the bargaining of those employers and employees actually involved in the selected construction projects in [the] county." *Id.* Thus, the court found that the ordinance affected the bargaining process in a "much more invasive and detailed fashion than the isolated statutory provisions of general application approved in *Metropolitan Life* and *Fort Halifax.*" *Id.*

The court also made a clear distinction between the prevailing wage law at issue in the case and a "minimum wage law, applicable to all employees, guarantying a minimum hourly rate." *Id.* The court noted that the prevailing wage law provided for specific wages and benefits to be paid to each craft and only to those workers who were engaged in specific construction projects in the county. *Id.* This resulted in a "minimum wage and benefit package that is promulgated by the Director of the Department of Industrial Relations of the State of California, and ... developed by averaging the bargains struck by other employers and employees." *Id.* at 502–03.

Discussing the state's general police power to enact such a law, the Ninth Circuit expressed concern with consequences of allowing the prevailing wage law to stand:

A precedent allowing this interference with the free-play of economic forces could be easily applied to other businesses or industries in establishing particular minimum wage and benefit packages. This could redirect the efforts of employees not to bargain with employers, but instead, to seek to set minimum wage and benefit packages with political bodies.... This substitutes the free-play of political forces for the free-play of economic forces that was intended by the NLRA.

*Id.* at 504. Thus, the Ninth Circuit found that *Machinists* preemption applied to invalidate the county ordinance. *Id.*

Applying the Ninth Circuit's decision in *Bragdon* to the facts of this case, there are important distinctions and parallels to be drawn. First, and most importantly, the Ordinance at issue in this case is distinguishable from the ordinance in *Bragdon* because it is not a prevailing wage statute; that is to say, it is not tied to collective bargaining agreements entered into by third parties. In *Bragdon*, the prevailing wage rate was determined by averaging the rates in collective bargaining agreements in the specific locality. As a result, employers were completely deprived of the ability to pay anything other than the rate that the few major unions had established in that locality.[7] The employer either had to enter into a collective bargaining agreement and pay the collective bargaining rate, or it could pay the prevailing wage, which was determined with reference to collective bargaining agreements established between third parties. Thus, the employers were faced with two options without a distinction, and the end result was to completely eviscerate the purpose of collective bargaining negotiations.

7. Indeed, the district court noted that a few large unions could effectively "set the prevailing wages for the state." *Baca,* 769 F.Supp. at 1545.

By contrast, in the Ordinance at issue here, the living wage is a fixed number that is not tied in any way to collective bargaining agreements between third parties. As a result, an employer can choose to pay the living wage, or it can enter into a collective bargaining agreement. The rates between the two options could be different, or they could be the same. Even if the negotiated rate turns out to be the same as the living wage, however, there is still an important distinction because the parties had the opportunity to negotiate freely. The important point is that the rate in the Ordinance is not tied directly to the rates established in collective bargaining agreements between third parties. Thus, the employer will have the opportunity to negotiate a collective bargaining agreement whose rates could be higher or lower than the living wage.[8] In light of this important distinction, the Court finds that the substantive requirements of the Ordinance are not so "restrictive as to virtually dictate the results of the contract," as was the case in *Bragdon*.

On the other hand, a significant parallel to be drawn with the ordinance at issue in *Bragdon*, is that the Ordinance here is not a statewide minimum wage law, but a City ordinance that targets a narrow class of employers. Legitimate concerns exist that employees and unions might focus their efforts to petition the local government for more localized ordinances in order to target individual businesses. This could lead to the result where cities and counties are passing ordinances with such onerous terms that business owners are virtually forced to enter into a collective bargaining agreement in order to pay lower wages. In extreme cases, this could potentially frustrate the purpose of the NLRA, by substituting the "free-play of political forces for the free-play of economic forces." *See Bragdon*, 64 F.3d at 504.

Although this is a legitimate concern that could affect whether an ordinance is so restrictive as to interfere with the collective bargaining process in certain cases, the Court finds no reason to believe that the Ordinance here would have such an effect. The Ordinance increases wages only moderately to approximately $10 per hour, which is most likely not more than most union rates. Moreover, the Ordinance provides an economic hardship exemption, which allows a hotel to obtain relief from the terms of the Ordinance, if it can demonstrate that the Ordinance would cause the hotel to (1) reduce its workforce by more than 20%, (2) curtail the hours worked by hotel workers by more than 30%, or (3) go bankrupt or shut down. Thus, the apparent intent of the Ordinance is not to strong-arm hotels into entering into collective bargaining agreements, but rather, to provide a living wage to the extent that the hotels can afford to do so. Viewed in light of the significant benefits that the hotels obtain from their close proximity to LAX, and the investments that the City plans to make in the Zone, there is no indication that the Ordinance is "an interest group deal in public-interest clothing" like the ordinance invalidated in *Bragdon*.

Furthermore, it is important to note that the Ninth Circuit has made a significant retreat from its holding in *Bragdon*, cautioning that "*Bragdon* must be interpreted in the context of Supreme Court authority and our other, more recent, rulings on NLRA preemption." *Nunn*, 356 F.3d at 990. In *Nunn*, the Ninth Circuit limited *Bragdon* to "extreme situations, when [substantive labor standards] are 'so

---

**8.** Plaintiff makes no allegation that the living wage is specifically tied to rates in other collective bargaining agreements.

restrictive as to virtually dictate the results' of collective bargaining." *Id.* The Ninth Circuit also effectively reversed *Bragdon's* holding to the extent that it the ruling was based on the concern that the ordinance targeted only "particular workers in a particular industry." *Id.* The court noted that "[i]t is now clear in this Circuit that state substantive labor standards, including minimum wages, are not invalidated simply because they apply to particular trades, professions, or job classifications rather than to the labor market." [9] *Id.*

■ Given the Ninth Circuit's analysis in *Nunn*, the Court finds that this is not such an "extreme situation," where the terms of the Ordinance virtually dictate the results of the collective bargaining process. Moreover, the legitimate concern with the targeted nature of the Ordinance expressed above takes on less importance to the overall analysis.

Plaintiff also argues that *Machinists* preemption applies because employers can "undercut" the living wage Ordinance by entering into collective bargaining agreements. (Opp'n, at 10.) Plaintiff argues that since employers are not subject to the living wage if they are party to a collective bargaining agreement, then the Ordinance does not set a true minimum wage. Plaintiff appears to overlook, however, several cases from the Ninth Circuit, which hold that such opt-out provisions for collective bargaining agreements are not preempted.

For example, in *National Broadcasting Co. v. Bradshaw,* the Ninth Circuit considered whether *Machinists* preemption invalidated a state law that required broadcast television employers to pay doubletime for all hours worked in excess of twelve hours, unless the employees were covered by a collective bargaining agreement. 70 F.3d 69, 71 (9th Cir.1995). The court began its analysis noting that in *Fort Halifax,* the Supreme Court recognized that "the enforcement of state minimum standards creates a 'backdrop' that must be taken into account in collective bargaining negotiations." *Id.* at 72, 107 S.Ct. 2211. The Ninth Circuit noted that the practical effect of the law was similar to the statute upheld in *Fort Halifax,* where there was a specific severance pay obligation unless the parties negotiated a different one. *Id.* Furthermore, the court noted that a recently decided Supreme Court case " 'cast no shadow on the validity of ... familiar and narrowly drawn opt-out provisions.' " *Id.* at 73, 107 S.Ct. 2211 (quoting *Livadas v. Bradshaw,* 512 U.S. 107, 131–32, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)); *see also Babler Bros., Inc. v. Roberts,* 995 F.2d 911, 915 (9th Cir.1993) (applying the reasoning in *Fort Halifax* to find a statute not preempted that exempted union employers from paying overtime wages).

Similarly, in *Viceroy Gold Corp. v. Aubry,* the Ninth Circuit found not preempted a California law that allowed only union employers to provide twelve-hour workdays, so long as the collective bargaining agreement expressly addressed the wages, hours, and working conditions for the employees. 75 F.3d 482, 486 (9th Cir.1996). The court found that the exemption for union employers was a "familiar and narrowly drawn opt-out provision," like the one upheld in *Bradshaw. Id.* at 489. In analyzing the statute at issue in the *Bradshaw,* the court noted that the opt-out provision "could have provided an incentive to unionize or to remain non-union, depending on the difference between the

---

**9.** In *Nunn,* the Ninth Circuit also emphasized that the court in *Bragdon* made an important distinction between a *"prevailing* wage ordinance" and *"minimum* wage regulations, which we acknowledged to be lawful." *Id.* at 991 n. 8 (emphasis in original).

contracted for and statutory overtime pay." *Id.* at 490. Thus, the Ninth Circuit concluded that a "potential benefit or burden in application does not invalidate an opt-out provision." *Id.* (quotations omitted).

In light of these decisions, the Court finds that the exemption for employers who enter into a collective bargaining agreement does not undercut the minimum living wage set by the Ordinance. Much like the state law in *Fort Halifax*, the living wage standard here merely forms the backdrop for collective bargaining agreements.[10] The parties are then allowed to negotiate their own agreements, which "strengthens the case that the statute works no intrusion on collective bargaining." *Fort Halifax*, 482 U.S. at 22, 107 S.Ct. 2211. As noted in *Viceroy*, the wage rates negotiated could be higher or lower than the living wage rate established by the Ordinance. The outcome would depend, of course, on the relative bargaining positions of the parties. Thus, under Ninth Circuit precedent, the exemption for union employers does not undercut the minimum wage requirement so as to preempt the Ordinance.

In conclusion, *Machinists* preemption does not apply to the Ordinance because it is a minimum labor standard compatible with the purposes of the NLRA. The Ordinance creates the backdrop for collective bargaining negotiations, and neither encourages nor discourages the collective bargaining process. Unlike the prevailing wage law at issue in *Bragdon*, the Ordinance does not frustrate the purpose of the NLRA by dictating the terms of collective bargaining agreements between the hotels and employees. Moreover, the living wage is not "undercut" by the fact that there is an exemption for certain collective bargaining agreements, given that the Ninth Circuit has repeatedly held that such narrowly tailored opt-out provisions are valid. Thus, Plaintiff's claim based on *Machinists* preemption is dismissed.

## C. Equal Protection

Plaintiff argues that the Ordinance violates guarantees of equal protection under both the United States Constitution and the California Constitution. *See* U.S. CONST. amend. XIV, § 1; CAL. CONST. art. I, § 7. Plaintiff contends that the Ordinance denies Plaintiff equal protection of the laws because it: (1) allows unionized hotels within the Zone to be exempt from the Ordinance through collective bargaining; (2) singles out a class of hotel owners for disparate treatment from other business owners; (3) does not cover hotels with less than fifty rooms; (4) does not apply to other hotels located within Los Angeles; and (5) allows a waiver of the conditions of the Ordinance if the hotel employer can demonstrate a reduction in workforce or total hours worked by employees. (Opp'n, at 14.)

The Fourteenth Amendment of the United States Constitution, and Article 1, Section 7 of the California Constitution, each "prohibit denial to persons of the equal protection of the laws." *Britt v. City of Pomona*, 223 Cal.App.3d 265, 274, 272 Cal.Rptr. 724 (Ct.App.1990). For the most part, equal protection analysis under the federal and California constitutions are " 'substantially similar.' " *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir.2004) (quoting *L.A. County v. S.*

---

**10.** This is especially so here because the Ordinance only exempts collective bargaining agreements with express terms stating that the living wage rate established by the Ordinance will not apply. (Ordinance, at 8.) Thus, even employers who are presently signatory to a collective bargaining agreement will have to modify the terms of the collective bargaining agreement in order to be exempted.

*Cal. Tel. Co.,* 32 Cal.2d 378, 196 P.2d 773 (1948)); *see also People v. Hofsheier,* 37 Cal.4th 1185, 1200–02, 39 Cal.Rptr.3d 821, 129 P.3d 29 (2006) (construing federal California equal protection guarantees together); *Britt,* 223 Cal.App.3d at 274, 272 Cal. Rptr. 724 (same); *Cooper v. Bray,* 21 Cal.3d 841, 847–48, 148 Cal.Rptr. 148, 582 P.2d 604 (1978) (same); *Brown v. Merlo,* 8 Cal.3d 855, 860, 106 Cal.Rptr. 388, 506 P.2d 212 (1973) (same).

▉▉▉▉ Since the Plaintiff does not allege that application of the Ordinance impinges on a fundamental right or targets a suspect class, it is subject to rational basis review. *RUI One Corp.,* 371 F.3d at 1154. As defined by the Supreme Court, particularly with regard to economic regulations such as the Ordinance, rational basis review requires the Court to "determine whether there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* (quoting *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)); *see also SeaRiver Maritime Fin. Holdings, Inc. v. Mineta,* 309 F.3d 662, 679 (9th Cir.2002). In making this determination, the Court need not determine the actual motive of the City Council in passing the Ordinance or engage in fact-finding with regard to the rationality of conceivable motives. *RUI One Corp.,* 371 F.3d at 1155. However, California Supreme Court has noted that, in its view, all formulations of the rational basis test "require the court to conduct a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals." *Cooper,* 21 Cal.3d at 848, 148 Cal.Rptr. 148, 582 P.2d 604. The California Supreme Court has also noted that any rationale for the legislation at issue "must be plausible and the factual basis for that rationale must be reasonably conceivable." *Hofsheier,* 37 Cal.4th at 1201, 39 Cal.Rptr.3d 821, 129 P.3d 29 (emphasis and quotations omitted).

The controlling case in this area is *RUI One Corp. v. City of Berkeley,* 371 F.3d 1137 (9th Cir.2004). In *RUI One,* the Ninth Circuit has rejected an equal protection challenge to a living wage city ordinance that targeted only employers of a certain size within a certain zone of the City of Berkeley. *Id.* at 1156. The Berkeley ordinance required employers located in the Berkeley Marina with six or more employees, and revenues of $350,000 or more per year, to pay employees a "living wage." *Id.* at 1145. The living wage was established at $9.75 per hour with benefits, or $11.37 per hour without benefits. *Id.* at 1143–44. The ordinance went into effect immediately upon passage by the city council, and included businesses that were not lessees of city property, including food vendors and charter boats. *Id.* at 1145. The stated purpose of the Berkeley ordinance was to serve the public interest "by requiring large Marina employers to pay their employees a living wage because operating a business in the public trust land of the Marina is a privilege." *Id.* Moreover, the city council reasoned that "the City expends considerable resources in maintaining and promoting the Marina, in turn affording Marina businesses significant financial benefits, a reasonable portion of which should be used to provide employees with appropriate wages and benefits." *Id.*

Analyzing the equal protection challenge, the Ninth Circuit considered the plaintiff's argument that the purported reasons for the law were not the real reasons motivating the enactment of the Berkeley ordinance, but rather it was a ploy to help unionize hotels in the Marina. *Id.* at 1155. The Ninth Circuit refused to conduct a more searching review of the legislative motivations, however, finding that it was "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actu-

ally motivated the legislature." *Id.* (quotations omitted).

The plaintiff also argued that the Berkeley ordinance was unconstitutional because it imposed the living wage only on Marina businesses, and not on other businesses in other areas of the city. *Id.* The Ninth Circuit rejected this argument noting that "[s]uch legislative decisions are 'virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.'" *Id.* (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Moreover, "reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others" *Id.* (quotations omitted). Thus, the Ninth Circuit concluded that it was "certainly rational ... for the City to treat Marina businesses differently from their competitors outside the Marina." *Id.* at 1156.

 In light of the Ninth Circuit's decision in *RUI One*, it is clear that there is a rational basis for the Ordinance at issue here. The City Council acted rationally when it concluded that in exchange for the "significant and unique business benefits" that the hotels enjoy from their close proximity to the airport, and the significant capital contributions that the City plans to make in the Zone over the coming years, that the hotels should be required to pay a living wage. The City made it very clear that the purpose of the Ordinance is to "improve and encourage the continuing growth and development of the business community in the Century Boulevard Corridor, while simultaneously improving the welfare of service workers at LAX-area

hotels by ensuring that they receive decent compensation for the work they perform." (Ordinance, at 1.) The Court finds the Ordinance is rationally related to the City's legitimate legislative goal.

Plaintiff's arguments to the contrary are unavailing. The Court will not engage in a more searching scrutiny of the legislative purposes, given the Ninth Circuit's admonition that the actual motivations are "entirely irrelevant." *See RUI One*, 371 F.3d at 1155. Moreover, it makes no difference that the Ordinance here only targets hotels in a certain area of the City near the airport, as the Ninth Circuit has said that legislative bodies must be able to approach problems, such as depressed wages, "incrementally." *See id.*

Finally, the Ordinance's exceptions for workers party to a collective bargaining agreement could rationally arise from the expectation that unionized workers are better able to protect their interests with regard to wages than non-unionized workers. *See Viceroy*, 75 F.3d at 490–91 ("[T]he California Legislature could rationally have believed that workers covered by collective bargaining agreements ... have greater power to ensure safe working conditions than workers with individual employment agreements.").[11]

Thus, the Court finds that there is a rational basis for the Ordinance, and it does not violate equal protection guarantees of the United States and/or California Constitutions.

**D. Retroactivity**

 Plaintiff also seeks a declaration from the Court that the Ordinance cannot be applied retroactively. Plaintiff contends that since there has been a long

---

**11.** Plaintiff cites a Los Angeles Superior Court case in support of its argument that the Ordinance is unconstitutional. However, the case is currently on appeal and, therefore, has little persuasive effect in this Court.

delay in actually implementing the Ordinance, due in large part to Plaintiff's legal challenges to the statute, that the Ordinance "could be improperly applied as retroactive." (Opp'n, at 19.) The Court finds that this claim is not ripe and should therefore be dismissed.

■ The ripeness inquiry depends on "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dept. of the Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). On the first prong, Plaintiff argues that the issues are fit for judicial decision because Plaintiff makes a facial challenge to the statute, and there is no need for further factual development in order to determine whether the Ordinance is retroactive. The Court does not disagree with this contention, but finds that Plaintiff has not demonstrated sufficient likelihood of hardship from withholding determination of the issue.

Plaintiff relies on *Metropolitan Milwaukee Association of Commerce v. Milwaukee County*, where the Seventh Circuit found that a challenge to a local ordinance was ripe for adjudication. 325 F.3d 879, 882 (7th Cir.2003). There, the court said that the plaintiffs could show hardship by demonstrating that either (1) enforcement of the statute was certain, only delayed, or (2) the mere threat of future enforcement has a "present concrete effect" on the plaintiff's day-to-day affairs and "irremediably adverse consequences" would flow from a later challenge. *Id.* The court

found that the plaintiffs had established sufficient hardship because they had received contract renewal offers from the county since the enactment of the local ordinance, which required the plaintiffs to agree to abide by the provisions of the ordinance or "give up lucrative County contracts that, in some cases, are the lifeline of their business." *Id.* at 883. Thus, the controversy was ripe for determination.[12]

In contrast, here, Plaintiff has provided the Court with no reason to believe that the Ordinance will be applied retroactively. Other than the general statement that the "language found in the Ordinance ... could be improperly applied as retroactive," there is no allegation that the City might seek to enforce the Ordinance retroactively or that individual employees will seek to recover past wages. In fact, Plaintiff states in the Complaint that there is "no language in the Ordinance stating or even implying that the Ordinance is retroactive." (Compl., at 15.) Thus, Plaintiff has not demonstrated hardship and the issue of retroactivity is not ripe for adjudication. *See Chang v. United States*, 327 F.3d 911, 921 (9th Cir.2003) ("[Ripeness] turns on the constitutional consideration of whether the plaintiffs face a realistic danger of sustaining direct injury from the challenged act." (quotations omitted)).[13]

## IV. CONCLUSION

The Court finds that the Ordinance is not preempted by federal labor law and does not violate guaranties of equal protection under the United States and California Constitutions. Moreover, whether the

---

**12.** Plaintiff relies on other cases where the court found similar level of hardship. *See, e.g., Abbott Labs.*, 387 U.S. at 149, 87 S.Ct. 1507 (finding ripeness where the FDA regulation provided for criminal penalties for noncompliance).

**13.** Because the Court dismisses Plaintiff's claims on the merits, the Court does not address Defendants' other arguments based on impermissible claim-splitting, res judicata, and laches. (*See* Mot., at 20–24.)

statute has retroactive application is not ripe for adjudication. Thus, Defendants' Motion to Dismiss is hereby GRANTED.

IT SO ORDERED.