**AMERICAN HOTEL & LODGING ASSOCIATION et al.**
**Plaintiff,**

v.

**CITY OF LOS ANGELES, Defendants.**

**Case No. CV 14–09603–AB (SSx)**

United States District Court,
C.D. California.

Signed May 13, 2015

Michael Starr, Katherine H. Marques, Holland and Knight LLP, New York, NY, John Andrew Canale, Kristina Starr Azlin, Holland and Knight LLP, Los Angeles, CA, for Plaintiff.

Ronald S. Whitaker, Sara Ugaz, Los Angeles City Attorney's Office, Los Angeles, CA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION;

## ORDER DENYING DEFENDANT'S MOTION TO STRIKE

HONORABLE ANDRÉ BIROTTE, JR., UNITED STATES DISTRICT COURT JUDGE

Plaintiffs American Hotel & Lodging Association and Asian American Hotel Owners Association ("Hotel Associations" or "Hotels" or "Plaintiffs") have filed a motion for a preliminary injunction (Dkt. No. 23), seeking an order staying the effective date and enjoining the enforcement of a Los Angeles minimum wage ordinance on the ground that it is preempted by the National Labor Relations Act.

There has been no shortage of briefing on this motion. Defendant City of Los Angeles ("City") and Defendant–in–Intervention UNITE HERE Local 11 ("Local 11") (collectively "Defendants") filed opposition briefs, as well as a supplemental brief to notify the Court of a recently decided case from the Second Circuit on a similar issue. (Dkt. Nos. 56, 76, 82.) Plaintiffs filed reply briefs, including an objection and response to Defendants' supplemental brief. (Dkt. No. 71, 81, 84.) The United States Chamber of Commerce and the Coalition for a Democratic Workplace filed a brief as amici curiae in support of Plaintiff' preliminary injunction motion. (Dkt. No. 78.)

Separately, the City filed objections to the evidence submitted in support of Plaintiffs' pending motion (Dkt. No. 60), as well as a motion to strike the same evidence addressed in the objections. (Dkt. No. 62.) Plaintiffs filed a response to the objections (Dkt. No. 72) and a brief in opposition to the City's motion to strike. (Dkt. No. 68.) The City filed a reply brief in support of its motion to strike. (Dkt. No. 70.)

A lengthy hearing was held on April 6, 2015. Having considered the materials and argument submitted by the parties, and for the reasons indicated below, the Court hereby **DENIES** Plaintiffs' motion for a preliminary injunction. (Dkt. No. 23.)

## I. BACKGROUND

At issue in this case is Los Angeles Ordinance No. 183241, Citywide Hotel Worker Minimum Wage Ordinance ("Wage Ordinance"), which the City passed in October 2014. (Dkt. No. 24, Azlin Decl., ¶ 2, Exhibit 1 ("WO").) The Wage Ordinance provides minimum wage and compensated time off protections for workers at large hotels (hotels with more than 150 rooms) in Los Angeles.

### A. Prior Wage–Related Ordinances

The Wage Ordinance is not the first of its kind. In 1997, the City adopted a "living wage" ordinance, which mandates, among other things, that employers who employ airport workers and perform certain contract or subcontract work for the City pay their employees a minimum living wage (hereinafter referred to as the "Airport LWO") above and beyond that required by the then-state minimum wage. *See* L.A. Admin Code § 10.37 *et seq.*; *see also* Dkt. No. 57 City's Request for Judicial Notice ("City's RJN"), Exhibits 1–2.[1]

---

1. The City seeks judicial notice of several Los Angeles ordinances and the corresponding administrative code sections that codify those ordinances. (Dkt. No. 57, City's RJN, Exhibits 1–6.) Under Federal Rule of Evidence 201, a court may take judicial notice of laws, regulations, and rules because they are matters of public records and therefore "not subject to reasonable dispute in that [they are] capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n. 2 (9th Cir.2006) (quoting Fed.R.Evid. 201). The Court grants the City's unopposed request with respect to RJN Exhibits 1–7.

As of 2013, the Airport LWO required subject employers to pay their employees a minimum wage of $15.37 per hour if the employer offered no fringe benefits or $10.71 per hour if fringe benefits were valued at least $4.67 per hour. (Mohrfeld Decl. ¶ 16.)[2]

In 2006 and 2007, the City adopted two ordinances regulating large hotels in the "LAX Corridor," a stretch of Century Boulevard near the Los Angeles International Airport.[3] In 2006, the City enacted the Hotel Service Charge Reform Ordinance ("Service Charge Ordinance"), Ordinance No. 178084, which "require[d] LAX-area hotels to pass along service charges to those hotel service workers who actually rendered the services for which the charges are collected." (City's RJN, Exhibits 3–4.) The ordinance was passed following the City's determination that service workers had experienced decreased income as a result of hotel customers assuming that mandatory service charges are paid to the workers and therefore opting not to leave gratuities.

In 2007, the City passed the Airport Hospitality Zone Enhancement Ordinance ("AHZE Ordinance"), Ordinance No. 178432, which included a living-wage provision that established minimum wages for employees of covered hotels. (City's RJN, Exhibits 5–6.) As of 2013, the AHZE Ordinance living wage was $11.03 per hour if the employer provided fringe benefits valued at $1.25 per hour, or $12.28 per hour if the employer provided no fringe benefits.[4] (Mohrfeld Decl. ¶¶ 15–16.)

## B. Events Leading up to the Passage of Wage Ordinance

On February 18, 2014, several Los Angeles City councilmembers made a motion to secure a study and provide for public input of the Citywide economic impacts of imposing a living wage of $15.37 per hour for hotel employees at hotels with more than 100 rooms. (Dkt. No. 58, Dickinson Decl., ¶ 5, Exhibit 2.)

The City commissioned Blue Sky Consulting Group to conduct the study, which was completed and delivered to the City in June 2014. (*Id.* at ¶ 6, Exhibit 3.) Blue Sky's executive summary explained that while an increased minimum wage would increase hotel workers' wages, only a fraction of those increased wages would be spent within city limits (thereby benefit-

2. In 2012, an LAX contractor sued the City, alleging, among other things, that the Airport LWO was preempted by the federal Railway Labor Act, among other claims. The district court rejected the plaintiff's preemption theory and granted summary judgment in favor of the City. *See Calop Bus. Sys., Inc. v. City of Los Angeles,* 984 F.Supp.2d 981, 990 (C.D.Cal. 2013) (Ninth Circuit appeal pending).

3. These ordinances define terms like "Hotel," "Hotel Employer," "Hotel Worker," and "Service Charges," and the ordinances include exemptions for collective bargaining agreements. The definitions and collective bargaining exemptions are identical to those included in the Wage Ordinance at issue in this case and are reproduced below.

4. In 2008, an airport hotel subject to the AHZE Ordinance filed a lawsuit, arguing among other things that the ordinance was preempted under the National Labor Relations Act. The district court granted the City's motion to dismiss, holding that the ordinance was not preempted because it "simply set[ ] the rate of the 'living wage' and then allow[ed] the hotels to enter into a collective bargaining agreement if they wish[ed to do so]. The [ordinance imposed] no restrictions on the terms of the collective bargaining agreement [but rather] allowed a collective bargaining agreement to set wages at a rate higher or lower than the wage set by the Ordinance." *Fortuna Enterprises, L.P. v. City of Los Angeles,* 673 F.Supp.2d 1000, 1005–06 (C.D.Cal.2008). The *Fortuna* plaintiff initially appealed the district court's order, but the appeal was voluntarily dismissed pursuant to a stipulation by the parties. *See id.,* No. CV 08–4373 SVW (MANx) at docket entry 32.

ting the economy), and any benefits to the increased minimum wage would be offset by the detriments to the economy:.

> [I]n response to the minimum wage increase, hotel profits would likely decline, and so too would the value of existing hotels; some hotels might be forced to sell or otherwise restructure their investments. Hotel owners would also seek ways to minimize the effects of a minimum wage increase, but most of the Los Angeles hotels subject to the new requirement would be limited in their ability to pass along any increased labor costs in the form of higher room rates. The result would therefore likely be reductions in staffing levels and reductions in certain purchases of goods and services in the local economy. Both of these effects would lead to reductions in economic activity which would at least partially offset any gains in economic activity generated by increased spending by those hotel workers who received a raise under the policy.

(*Id.*) The City also received several reports and comment letters from members of the public and interested parties regarding the proposed minimum wage, many of which expressed strong opposition to the proposal. (*Id.* at ¶ 7, Exhibit 4.) These reports and letters were submitted to the City before Blue Sky completed its report, and Blue Sky considered them in its analysis. (*Id.*)

The City then asked three economist firms—PFK Consulting, Economic Roundtable, and Beacon Economics—to analyze the economic impact of the proposed hotel workers minimum wage. In September 2014, the City Economic Development Committee prepared a report, summarizing the firms' findings. (*Id.* at ¶ 10, Exhibit 7.) PFK Consulting concluded that while the minimum wage increase would positively impact hotel employees, there would be a negative impact on hotels that would have to compensate for the

higher wages by cutting costs and reducing operations and a negative impact on hotel employees who might, as a result, be laid off or have their hours reduced. Beacon Economics concluded that the minimum wage ordinance would result in job losses and questioned whether the proposed wage ordinance was the appropriate method for improving wages. Economic Roundtable concluded that the minimum wage ordinance is a prudent method to raise wages for hotel workers, who are some of the lowest paid workers in Los Angeles. The City Economic Development Committee's report also summarized the public comments on the proposed minimum wage ordinance, which included concerns that the minimum wage ordinance would disproportionately affect smaller hotels, that food and beverage operators within hotels would be at a competitive disadvantage to similar operations outside of hotels, and that hotels and hotel employees would be negatively impacted by reduced operations, employee layoffs, and possible closure as a result of absorbing the higher wage costs. Despite these negative concerns, the Economic Development Committee recommended that the City adopt the Wage Ordinance (subject to an amendment that the ordinance only apply to hotels with 150 rooms or more), largely because the increased wage rate would positively affect thousands of hotel employees and their families. (*Id.*)

Having considered the input from the public and interested parties, as well as the various consulting and economist firms, the City Council adopted the Wage Ordinance and signed the final version into law in October 2014. (*Id.* at ¶ 11, Exhibit 8.)

## C. Local 11's Current Role as the Only Union for Hotel Workers in Los Angeles

Currently, Local 11 is the only union representative for hotel workers in Los

Angeles, and Local 11 has a practice of organizing hotel workers only when the employer consents to card-check recognition and "neutrality" agreements. (*See, e.g.,* Dkt. No. 37, Wlodkowski Decl. ¶ 16; Dkt. No. 28, Gleason Decl. ¶¶ 26–27.) In its most basic form, a neutrality agreement involves an employer's agreement to remain neutral during the union campaign and election process, *i.e.,* neither encouraging nor discouraging employees to unionize, despite the employer's right under federal labor law to speak out for or against unionization. A card-check recognition agreement involves an employer's agreement to forego its right under the National Labor Relations Act to demand an NLRB-sponsored secret ballot election and instead voluntarily recognize the union so long as a majority of the bargaining unit employees sign union authorization cards. (*See generally* Dkt. No. 26, Eigen Decl. ¶¶ 38–46.)

Local 11 concededly lobbied for the passage of the Wage Ordinance. (Dkt. No. 76, Local 11 Opp. at 2–3; *see also* Dkt. No. 25, Mohrfeld Decl. ¶¶ 12–13.)

### D. Substantive Terms of the Wage Ordinance

#### 1. Stated purpose

The City's official stated purpose for passing the Wage Ordinance is to promote "an employment environment that protects government resources," and to promote "the health, safety and welfare of thousands of hotel workers by ensuring they receive decent compensation for the work they perform." (WO at 1–2.) Specifically, the Wage Ordinance provides:

> The City has made significant financial investments to create a climate that has allowed the hospitality industry to thrive in Los Angeles. ... Because hotels receive benefits from City assets and investments and because the City and its tourist industry benefit from hotels with experienced and content workers with low turnover, it is fair and reasonable that hotels pay their employees a fair wage....
>
> 43 percent of the people who work in hotels in Los Angeles earn wages that put them below the federal poverty line. Wages paid to hotel employees are economically restrictive and prevent many hospitality employees from exercising purchasing power at local businesses, which takes a toll on the local economy.... [T]he City has an interest in promoting an employment environment that protects government resources. In requiring the payment of a higher minimum wage [to hotel workers], this article benefits that interest.
>
> ...
>
> Income equality is one of the most pressing economic, social and civil rights issues facing Los Angeles. By proceeding incrementally and applying a minimum wage to hotel workers at larger hotels ... the City seeks to promote the health, safety and welfare of thousands of hotel workers by ensuring they receive decent compensation for the work they perform.
>
> A large hotel, one containing more than 150 rooms, is in a better position to absorb the cost of paying living wages to its employees and also to absorb costs without layoffs.

(*Id.*)

#### 2. Relevant definitions

The Wage Ordinance contains the following definitions that are relevant to the Court's analysis:

> "Hotel" means a residential building that is designated or used for lodging and other related services for the public, and containing 150 or more guest rooms, or suites of rooms (adjoining rooms do not constitute a suite of rooms).

"Hotel Employer" means a Person who owns, controls and/or operates a Hotel in the City, or a Person who owns, controls and/or operates any contracted, leased, or sublet premises connected to or operated in conjunction with the Hotel's purpose, or a Person who provides services at the Hotel.

"Hotel Worker" means any individual whose primary place of employment is at one or more Hotels and who is employed directly by the Hotel Employer, or by a Person who has contracted with the Hotel Employer to provide services at the Hotel. "Hotel Worker" does not include a managerial, supervisory, or confidential employee....

"Service Charge" means all separately-designated amounts, regardless of name or label, collected by a Hotel Employer from a customer for service by Hotel Workers, or described in such a way that customers might reasonably believe that the amounts are for the service including, but not limited to those charges designated on receipts under the term "service charge," "delivery charge" or "porterage charge."

(*Id.* at 3–4.)

### 3. Substantive terms

The substantive terms of the Wage Ordinance relevant to the instant motion are the minimum wage and service-charge pass-through provisions, as well as the exemption and waiver provisions for collective bargaining agreements.

*Minimum Wage.* The minimum wage provision requires Hotels to pay Hotel Workers a minimum wage of $15.37 per hour, to be adjusted annually, "not including gratuities, Service Charge distributions or bonuses," and not including any off-sets for employer fringe-benefit contributions. (*Id.* at 4.) The wage provision is set to go into effect on July 1, 2015 for Hotels with 300 rooms or more and on July 1, 2016 for Hotels with 150 rooms or more. (*Id.* at 6.)

*Service–Charge Pass–Through.* The service-charge provision requires Hotel Employers to pay Service Charges in their entirety to the "Hotel Worker(s) performing services for the customers from whom the Service Charges are collected." (*Id.*) Hotel Employers are further required to pay the Hotel Worker(s) "equitably and according to the services that are related to the description of the Service Charges given ... to the customer." (*Id.*)

*Enforcement Provision.* The Wage Ordinance includes a private right of action for Hotel Workers alleging violations of the ordinance and allows recovery of treble damages, attorney's fees, and costs. (*Id.* at 7–8.)

*Exemption for Collective Bargaining Agreements.* The Wage Ordinance includes an exemption for Hotel Workers whose employment is covered by a collective bargaining agreement:

All of the provisions of this article, or any part of this article, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in that agreement in clear and unambiguous terms. Unilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver....

(*Id.* at 8.)

*One–Year Waiver for Certain Hotel Employers.* The Wage Ordinance provides that it is "not intended to cause reduction in employment or work hours for Hotel Workers." (*Id.*) Accordingly, Hotel Employers can obtain one-year waivers from the Wage Ordinance with a showing that compliance would force the employer, "in order to avoid bankruptcy or a shutdown of the Hotel, to reduce its workforce by more than 20 percent or curtail its

Hotel Workers' total hours by more than 30 percent." (*Id.*)

#### 4. Instant motion for a preliminary injunction

The Hotel Associations seek an order staying the effective date and enjoining the enforcement of the Wage Ordinance on the sole ground that it is preempted by the National Labor Relations Act. According to Plaintiffs, the ordinance interferes with collective bargaining, union organizing, and labor relations at all Los Angeles hotels subject to the ordinance by "improperly aid[ing]" Local 11 in its efforts to organize employees at non-union hotels, and disrupting the balance of economic power between Local 11 and unionized hotels by giving the union an economic weapon for which it would otherwise have to bargain. Thus, Plaintiffs argue, the Wage Ordinance is preempted because it improperly regulates a zone of activity that Congress intended to leave unregulated and subject to the free play of economic forces. (Dkt. No. 23, Mot. at 1.)

### II. LEGAL STANDARD

▮ "A preliminary injunction is an extraordinary and drastic remedy." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir.2014) (quoting *Munaf v. Geren*, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008)). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of hardships tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir.2009). The *Winter* factors are considered in conjunction with the Ninth Circuit's "sliding scale" approach, which provides that "the ele-ments of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 739 (9th Cir.2011).

"In one version of the 'sliding scale,' a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor." *Id.* at 740 (internal quotation marks omitted; brackets in original) (noting that the "serious questions" test survives *Winter*). Therefore, "serious questions going to the merits and a hardship balance that tips sharply in the plaintiff's favor can support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (internal quotation marks omitted).

### III. DISCUSSION

#### A. Objections and Motion to Strike Plaintiffs' Evidence

The City objected to and moved to strike nearly every aspect of every piece of evidence submitted by the Plaintiffs in support of the pending motion. (Dkt. Nos. 60, 62.) The objections generally concern standard evidentiary issues, such as hearsay, foundation, improper opinion, personal knowledge, speculation, and relevance. To cover their bases, Plaintiffs submitted lengthy responses, spanning hundreds of pages, to the City's objections and motion to strike. (Dkt. Nos. 68, 72.)

▮ It is well established that trial courts can consider otherwise inadmissible evidence in deciding whether to issue a preliminary injunction. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) ("[A] preliminary injunction is customarily

granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits"); *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial"). "Indeed, district courts have considerable discretion to consider otherwise inadmissible evidence when ruling on the merits of an application for a preliminary injunction." *Garcia v. Green Fleet Sys., LLC*, 2014 WL 5343814, *5 (C.D.Cal. Oct. 10, 2014) (citing *Flynt*, 734 F.2d at 1394; *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir.1988) (observing that the rules of evidence do not strictly apply to preliminary injunction proceedings)). While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility. *Id.*

The Court has reviewed each of the City's objections and Plaintiffs' responses. The Court finds the City's objections largely to be "boilerplate recitations of evidentiary principles or blanket objections without analysis." *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F.Supp.2d 1198, 1200 n. 1 (C.D.Cal.2010). Thus, it would be both "unnecessary and impractical" for the Court "to methodically scrutinize each objection and give a full analysis of each argument raised." *Id.* Accordingly, and in light of the relaxed evidentiary standard at this stage in the proceedings, the Court summarily holds that evidentiary objections inconsistent with this ruling and/or not discussed in the text of this order are **OVERRULED**. All other objections are

**SUSTAINED**. The City's motion to strike (Dkt. No. 62) is **DENIED** as moot, as it is duplicative in substance to the City's objections and largely overlaps with the legal arguments made in the City's opposition brief.

The Court now turns to the substance of Plaintiffs' motion for a preliminary injunction.

### B. Plaintiffs Have Not Shown a Likelihood of Success On the Merits

#### 1. *Machinists* preemption

■ Two preemption doctrines carry out the federal labor policy that Congress created when it passed the National Labor Relations Act ("NLRA"). The first doctrine is known as *Garmon* preemption, *see San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), which "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 613, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (quotations omitted); *Dillingham Const. N.A., Inc. v. County of Sonoma*, 190 F.3d 1034, 1041 (9th Cir. 1999) ("[*Garmon*] preempts state laws that attempt to regulate conduct [that] is either arguably protected or prohibited by the NLRA.").

■ The second doctrine, *Machinists* preemption, is at issue in this case. *See Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). *Machinists* prohibits states from regulating conduct that Congress intended to be "controlled by the free play of economic forces." *Id.* ("[In enacting the NLRA], Congress struck a balance of protection, prohibition, and laissez-faire in respect to

union organization, collective bargaining, and labor disputes"); *Dillingham*, 190 F.3d at 1038 ("Under the *Machinists* preemption doctrine, the NLRA preempts state laws and state causes of action that regulate activity Congress intended to leave unregulated."). "States are therefore prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts, unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp.*, 475 U.S. at 614–15, 106 S.Ct. 1395 (citations omitted). "Whether self-help economic activities are employed by employer or union, the crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'" *Id.* Thus, *Machinists* preemption "turns on the actual content of [the ordinance] and its real effect on federal rights." *Chamber of Commerce of the United States v. Brown ("Brown")*, 554 U.S. 60, 69, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008) (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 119, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994)).

### 2. Application of *Machinists* to the Wage Ordinance

Plaintiffs argue that—with one exception—the Wage Ordinance is preempted not because of any single provision but based on how various provisions of the ordinance interact with one another. In summary fashion, Plaintiffs argue the following provisions and their effects render the Wage Ordinance preempted.

- The $15.37 per hour minimum wage provision—which does not include gratuities, service charge distributions, bonuses, or off-sets for fringe-benefit contributions—is so onerous that it is not the type of "minimum" labor standard contemplated by *Machinists* case law. (Mot. at 14; Reply to City's Opp. at 10.)

- The minimum wage provision's onerous dollar amount is augmented by its disregard of the hotel industry's distinction between tipped and non-tipped employees, which creates exceedingly costly compensation schemes inconsistent with hotel economies and in effect requires hotels to increase compensation for their most highly compensated employees who already earn more than $15.37 per hour. (Mot. at 5; Reply to City's Opp. at 11.)

- The waiver provision empowers unions to waive the Wage Ordinance's economically "onerous" wage requirements, while affirmatively denying non-union employees that same option. (Mot. at 4–5; Reply to City's Opp. at 11.)

- The provision banning "unilateral implementation" of a collective bargaining agreement's terms disrupts the balance of economic power as contemplated under federal labor law.[5] (Mot. at 17–18; Reply to City's Opp. at 11.)

- By virtue of the aforementioned provisions, the Wage Ordinance purportedly "exerts extraordinary economic pressure" on non-union hotels to accept union demands for card-check recognition and neutrality agreements. (Mot. at 7, 13; Reply to City's Opp. at 11.)

At the April 6, 2015 hearing, the Plaintiffs again emphasized that the Court should not conduct the *Machinists* preemption analysis by looking at the Wage

---

5. Plaintiffs assert that this provision—the ban on unilateral implementation—in and of itself renders the Wage Ordinance preempted under the *Machinists* doctrine.

Ordinance provisions individually but instead should only consider how the various provisions, in the aggregate, interact with one another. While the Court agrees that the preemption analysis requires consideration of how the various provisions work together, the analysis ends (but does not begin) with this consideration. Rather, because the so-called "whole" of the Wage Ordinance is no greater than the sum of its "parts," the Court first considers each of the purported problematic provisions and then considers whether, in the aggregate, those provisions interact in a way that compels preemption.

### 3. $15.37 per hour minimum wage provision

■ The parties agree that minimum labor standards are not subject to *Machinists* preemption, so long as they are laws of general applicability (affecting union and non-union employees alike), and they neither encourage nor discourage collective bargaining or self-organizing. (Mot. at 21; City Opp. at 10–12; Local 11 Opp. at 7.) The general principle that governments can pass minimum labor standards pursuant to their police power without running afoul of federal labor law was established in *Metropolitan Life Ins. Co. v. Massachusetts ("Metropolitan Life")*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), and affirmed in *Fort Halifax Packing Co. v. Coyne ("Fort Halifax")*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). The Ninth Circuit has since held that in extreme cases, "substantive requirements could be so restrictive as to virtually dictate the results of the [collective bargaining and self-organizing process]." *Chamber of Commerce of U.S. v. Bragdon ("Bragdon")*, 64 F.3d 497, 501 (9th Cir. 1995).

The instant motion for a preliminary injunction begs the obvious question that the Ninth Circuit left open in *Bragdon*: where does the Court draw the line for "extreme" cases? When does a substantive minimum labor standard—in this case, a minimum wage provision—become so onerous and restrictive that it dictates what otherwise would be the result of the free-play of economic forces?

■ To answer this question, the Court turns to the basic principle of feasible economic alternatives and—to put a finer point on the guidance of *Bragdon*—holds that a minimum wage standard is *not* preempted so long as (1) paying the minimum wage and (2) entering into a collective bargaining agreement are both economically feasible, such that the parties have a meaningful choice as between the two alternatives. Under these circumstances, the substantive dollar amount of a minimum wage provision is *not* so onerous and extreme so as to virtually dictate what would otherwise be the result of the free-play of economic forces. Said another way—and at the risk of mixing metaphors—a minimum labor standard that simply "alters the playing field" does not compel preemption; but when a minimum labor standard not only "alters the playing field" but also "forces the hand" of one or both parties, then *Machinists* preemption applies. As articulated below, the Plaintiffs have failed to meet their burden that the Wage Ordinance's $15.37 per hour minimum wage is economically unfeasible, such that it deprives Hotel Employers from having a meaningful choice as between paying the minimum wage and entering into a collective bargaining agreement, thereby forcing the hand of non-union hotels to unionize.

Because the facts of *Metropolitan Life* and its progeny are central to the analysis, the Court begins with a review of the pertinent case law and then addresses Plaintiffs' various arguments.

### a. *Metropolitan Life*

In *Metropolitan Life*, the Supreme Court considered whether federal labor law preempted a Massachusetts law that required specific minimum mental-health care benefits to be provided under general insurance policies and employee healthcare plans. 471 U.S. at 727, 105 S.Ct. 2380. The Massachusetts Attorney General brought an enforcement action against an insurance company. The insurance company argued as a defense that the state law was preempted because "welfare benefits are a mandatory subject of bargaining" under federal labor law, and the law at issue would affect the terms of subsequent collective bargaining agreements between employers and employees. *Id.* at 751–52, 105 S.Ct. 2380. The Supreme Court rejected the defendant's argument and held that regulations "establishing minimum terms of employment" are not preempted under *Machinists*. *Id.* at 754, 105 S.Ct. 2380. The Supreme Court explained:

> The evil Congress was addressing [in passing the NLRA] was entirely unrelated to local or federal regulation establishing minimum terms of employment. Neither inequality of bargaining power nor the resultant depressed wage rates were thought to result from the choice between having terms of employment set by public law or having them set by private agreement. No incompatibility exists, therefore, between [the NLRA] and state or federal legislation that imposes minimal substantive requirements on contract terms negotiated between parties to labor agreements, at least so long as the purpose of the state legislation is not incompatible with these general goals of the NLRA.

*Id.* at 754–55, 105 S.Ct. 2380. Thus, because the Massachusetts law affected union and non-union employees equally and neither encouraged nor discouraged collective bargaining and the right to self-organ-ization, the Supreme Court held that the Massachusetts law survived *Machinists* preemption. *Id.* at 755, 105 S.Ct. 2380.

### b. *Fort Halifax*

Two years after deciding *Metropolitan Life*, the Supreme Court again considered the issue in *Fort Halifax*, 482 U.S. 1, 107 S.Ct. 2211 (1987). *Fort Halifax* involved a Maine statute that required employers to provide a one-time severance payment to processing plant employees when a subject plant closed in the state. *Id.* at 4, 107 S.Ct. 2211. Subject employers were exempt from the statute's severance requirements if an affected employee was covered by an "express contract providing for severance pay." *Id.* at 4 n. 1, 107 S.Ct. 2211. In defending an enforcement suit by former employees and state officials, the defendant processing plant argued that the severance statute was preempted on the grounds that the law "intrudes on the bargaining activities of the parties because the prospect of a statutory obligation undercuts an employer's ability to withstand a union's demand for severance pay." *Id.* at 20, 107 S.Ct. 2211. The Supreme Court again rejected this preemption argument:

> This argument—that a State's establishment of minimum substantive labor standards undercuts collective bargaining—was considered and rejected in [*Metropolitan Life*].... It is true that the Maine statute gives employees something for which they otherwise might have to bargain. That is true, however, with regard to *any* state law that substantively regulates employment conditions.

*Id.* at 20–21, 107 S.Ct. 2211 (citations omitted) (emphasis added). The Supreme Court explained that employers and employees come to the bargaining table with state law rights that form a "backdrop" for their negotiations. *Id.* at 21, 107 S.Ct. 2211. Absent a collective-bargaining

agreement, "state common law generally permits an employer to run the work-place as it wishes," and the "employer enjoys this authority without having to bargain for it." *Id.* at 21, 107 S.Ct. 2211 (emphasis added). The parties are free to negotiate around the state law backdrop, but "if impasse is reached, [then] the employer may rely on pre-existing state law to justify its authority to make employment decisions...." *Id.* "[T]he mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for there is nothing in the NLRA which expressly forecloses all state regulatory power with respect to those issues that may be the subject of collective bargaining." *Id.* (internal quotation marks, citations, and alterations omitted).

The *Fort Halifax* defendant sought, unsuccessfully, to distinguish the Maine severance statute from the Massachusetts mental-health care insurance statute in *Metropolitan Life*, arguing that the severance statute was not a "genuine minimum labor standard" because it only applied in the absence of an agreement covering severance pay. *Id.* at 22, 107 S.Ct. 2211. The Supreme Court flatly rejected this argument:

> The fact that the parties are free to devise their own severance pay arrangements ... *strengthens* the case that the statute works no intrusion on collective bargaining. Maine has sought to balance the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment. If a statute that permits no collective bargaining on a subject escapes NLRA preemption, *see Metropolitan Life,* surely one that permits such bargaining cannot be pre-empted.

*Id.* (emphasis added). Thus, the Supreme Court held, the severance statute was not

preempted but a "valid and unexceptional exercise of the State's police power." *Id.*

In this case, the Hotel Associations argue that the statutes at issue in *Metropolitan Life* (mental-health care benefits) and *Fort Halifax* (severance pay) were upheld not because they were minimum labor standards but rather because, as a result of their being *minimal* requirements, they did not actually interfere with collective bargaining. (Mot. at 20–24; Reply to City's Opp. at 11.) Here, in contrast (the Plaintiffs' argument goes), the wage provision is 70% higher than the current California minimum wage of $9 per hour, and therefore it is not the type of "minimum" standard contemplated by *Metropolitan Life* and *Fort Halifax*. (Mot. at 14.) To support their argument, the Hotel Associations direct the Court to *Bragdon*, 64 F.3d 497 (9th Cir.1995).

#### c. *Bragdon* and *Fortuna*

In *Bragdon*, the Ninth Circuit held that the *Machinists* doctrine preempted a Contra Costa County ordinance that required construction employers to pay "prevailing wages" on certain private industrial construction projects. *Id.* at 498. The prevailing wage determination was made "by reference to established collective-bargaining agreements within the locality in which the public work [was] to be performed." *Id.* In analyzing whether the prevailing wage ordinance was "incompatible with the goals of the NLRA," the Ninth Circuit noted that while "minimal substantive requirements" are not subject to *Machinists* preemption (citing *Metropolitan Life*), more onerous substantive requirements could affect the collective bargaining process:

> Viewed in the *extreme,* the substantive requirements could be so restrictive as to virtually dictate the results of the contract. The objective of allowing the bargaining process to be controlled by

the free-play of economic forces can be frustrated by the imposition of substantive requirements.... The question then becomes the extent of the substantive requirements that the state may impose on the bargaining process.

*Id.* at 501. In this context, the Ninth Circuit held that the prevailing wage ordinance was preempted because it "does much more than the type of state regulation that has previously been held not preempted." *Id.* Unlike minimum wage statutes, the prevailing wage concept was "derived from the combined collective bargaining of third parties in a particular locality." *Id.* at 502. The prevailing wage was neither a fixed statutory or regulatory minimum nor "the result of the bargaining of those employers and employees actually involved in the selected construction projects." *Id.* In this regard, the prevailing wage left employers with a false choice: in either scenario, employers could only ever pay a union bargained-for wage, and they were deprived of the freedom to choose something different.

Defendants argue that the Wage Ordinance is *not* an extreme case and direct the Court to the 2008 district court decision in *Fortuna,* which considered the applicability of *Bragdon* to the City's AHZE Ordinance, a regulation nearly identical to the Wage Ordinance at issue here. *Fortuna,* 673 F.Supp.2d 1000 (C.D.Cal.2008). As mentioned above (*see supra* note 4), the AHZE Ordinance established a minimum wage for Hotel Workers in the LAX Corridor. In analyzing *Bragdon,* the *Fortuna* district court noted that "[f]irst, and most importantly," the AHZE Ordinance was distinguishable from the one at issue in *Bragdon* because the AHZE Ordinance was *not* a prevailing wage statute; "that is to say, it is not tied to collective bargaining agreements entered into by third parties." *Id.* at 1009. The *Fortuna* district court went on to explain:

In *Bragdon,* the prevailing wage rate was determined by averaging the rates in collective bargaining agreements in the specific locality. As a result, employers were completely deprived of the ability to pay anything other than the rate that the few major unions had established in that locality. The employer either had to enter into a collective bargaining agreement and pay the collective bargaining rate, or it could pay the prevailing wage, which was determined with reference to collective bargaining agreements established between third parties. Thus, the employers were faced with two options without a distinction, and the end result was to completely eviscerate the purpose of collective bargaining negotiations.

*Id.* The AHZE Ordinance, in contrast, "is a fixed number that is not tied in any way to collective bargaining agreements between third parties. As a result, an employer can choose to pay the living wage, or it can enter into a collective bargaining agreement." *Id.* at 1010. The critical distinction from Bragdon is that in Fortuna, "the parties had the opportunity to negotiate freely," and thus "the substantive requirements of the [AHZE] Ordinance are not so 'restrictive as to virtually dictate the results of the contract,' as was the case in *Bragdon.*" *Id.*

The *Fortuna* district court, while distinguishing *Bragdon* in substance, accepted the premise that there are "legitimate concerns" that employees and unions will petition the local government for localized ordinances in order to target individual businesses, which, in extreme cases, could result in ordinances "with such onerous terms that business owners are virtually forced to enter into a collective bargaining agreement in order to pay lower wages." *Id.* (quoting *Bragdon,* 64 F.3d at 504). The *Fortuna* district court held that the AHZE Ordinance was not such an extreme case because the minimum wage

was only a few dollars per hour more than the then-state minimum wage, and it provided an economic hardship exemption for hotels facing reduction in their workforces, reduction in hours, bankruptcy, or shut down. Thus, "the apparent intent of the [AHZE] Ordinance is not to strong-arm hotels into entering into collective bargaining agreements, but rather to provide a living wage to the extent that the hotels can afford to do so." *Id.*

### d. Applying *Metropolitan Life* and its progeny to the Wage Ordinance at issue in this case, the $15.37 per hour minimum wage does not compel *Machinists* preemption

■■ The only difference between the text of the AHZE Ordinance,[6] which the *Fortuna* district court upheld as not preempted, and the Wage Ordinance at issue here is the dollar amount of the minimum wage. The AHZE Ordinance was approximately $2 per hour over the then-state minimum wage, while the Wage Ordinance here is just over $6 per hour over the current state minimum wage. At the April 6, 2015 hearing, the Court posed the question to Plaintiffs' counsel: what about the $15.37 per hour dollar amount makes the minimum wage provision an extreme case that compels *Machinists* preemption? Plaintiffs' only response was that there is "no single line" to be drawn to identify extreme cases, and that the absence of a "line" is immaterial because the Court must consider the minimum wage provision in the context of the Wage Ordinance's other provisions, i.e., the failure to distinguish between tipped and non-tipped employees, service-charge pass through restrictions, the union-waiver provision, and the ban on unilateral implementation. Plaintiffs' response is wholly insufficient.

A key point of Plaintiffs' preemption argument is that the $15.37 per hour wage provision is not the type of "minimum" standard contemplated by *Metropolitan Life* and *Fort Halifax because* the wage is so high. This necessarily requires the Court to consider the substantive dollar amount of the minimum wage provision and whether that dollar amount presents Hotel Employers with an economically feasible alternative to union organizing in order to determine how high is too high for purposes of NLRA preemption. By directing the Court's attention away from this critical question, Plaintiffs attempt to obfuscate the issue. Notably, Plaintiffs cannot identify a single case where any court held that a minimum labor standard was so onerous that it rendered the statute preempted.[7] This makes sense. Establishing preemption in this context is hard to do, and the Supreme Court has cautioned that "preemption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax*, 482 U.S. at 21, 107 S.Ct. 2211. The Court ventures to guess that a minimum wage standard would need to have a degree of outrageousness—an

---

6. *See* City's RJN, Exhibits 5–6.

7. In this regard, the distinction between cases involving substantive minimum labor standards, on the one hand, and cases involving statutes or regulations affecting labor relations, on the other hand, is both relevant and critical. *Compare, e.g., Brown,* 554 U.S. 60, 128 S.Ct. 2408 (2008) (holding preempted two provisions of a California statute where the provisions precluded the use of state funds "to assist, promote, or deter union organizing"), *and Golden State Transit Corp.,* 475 U.S. at 611–12, 106 S.Ct. 1395 (holding preempted the City of Los Angeles's decision to condition the renewal of a taxi cab franchise on the taxi cab company resolving a pending labor dispute with its union), *with Metropolitan Life,* 471 U.S. 724, 105 S.Ct. 2380 (holding not preempted a substantive minimum labor standard), *and Fort Halifax,* 482 U.S. 1, 107 S.Ct. 221 (same).

amount that is completely arbitrary and has no rational basis with respect to its intended purpose—for it to be considered an extreme case that compels preemption.

For reasons similar to those articulated in the *Fortuna* decision, the Court finds that Plaintiffs have failed to satisfy their burden in establishing that the Wage Ordinance's $15.37 per hour minimum wage is so onerous that it is inconsistent with the legislative goals and purposes of the NLRA and therefore preempted. As with the AHZE Ordinance, the Wage Ordinance minimum wage provision is not tied in any way to third party agreements, and so a Hotel Employer can choose to pay the minimum wage, or it can enter into a collective bargaining agreement. Either way, the parties can "negotiate freely." *Fortuna*, 673 F.Supp.2d at 1010. That the Wage Ordinance changes the backdrop for the negotiations is not significant because that would be the case with respect to *any* change in the minimum wage dollar amount. *See Fort Halifax*, 482 U.S. at 21, 107 S.Ct. 2211. Additionally, as with the AHZE Ordinance, the economic hardship exemption allows Hotel Employers to obtain relief from the Wage Ordinance if implementation of its terms would result in a 20% reduction of workforce or a 30% curtail in workers' hours, bankruptcy, or shut down. The hardship exemption, in essence, operates to give non-union Hotel Employers the necessary "out" before their compliance with $15.37 per hour minimum wage becomes so economically unfeasible as to compel preemption.

The Plaintiffs' own evidence disproves its preemption argument with respect to the Wage Ordinance's minimum wage provision. For example, in the declaration of Michael Wlodkowski—general manager for the Renaissance LAX, a non-union hotel in the LAX Corridor—Mr. Wlodkowski explains the economic impact of the hotel's prior compliance with the AHZE Ordinance beginning in 2007, as well as the anticipated economic impact of the hotel's compliance with the Wage Ordinance come July 1, 2015. (Dkt. No. 37, Wlodkowski Decl.) Because the Renaissance LAX does not have a collective bargaining relationship with any union, it was not and is not eligible for a waiver from the AHZE and Wage Ordinance's minimum wage provisions. Mr. Wlodkowski explains that the Renaissance LAX's estimated cost of compliance with the Wage Ordinance will be approximately $260,000 per year. (*Id.* at ¶¶ 14, 19.) This additional cost of compliance may put Renaissance LAX at a competitive disadvantage as compared to union hotels that are eligible for a waiver. (*Id.* at ¶¶ 17–20.) Critically, Mr. Wlodkowski's declaration suggests that Renaissance LAX will opt to absorb the economic cost of compliance rather than yield to Local 11 demands for card-check recognition and neutrality agreements. (*Id.*) Were Renaissance LAX to yield to Local 11's demands, the hotel would have a likely chance of unionizing (*see generally* Eigen Decl. ¶ 46), which in turn would make the hotel eligible for a Wage Ordinance waiver. Other declarations by representatives of nonunion Hotel Employers provide accounts that are similar to that of Renaissance LAX, *i.e.*, they concede that compliance with the Wage Ordinance's $15.37 per hour minimum wage, though undesirable, is economically feasible. (*See, e.g.*, Dkt. No. 29, Hannigan Decl. re Palomar Westwood; Dkt. No 30, Hsu Decl. re Hilton LAX Towers; Dkt. No. 32, Mora Decl. re LAX Courtyard Marriott; Dkt. No. 33, Roberts Decl. re Beverly Hills Crowne Plaza; Dkt. No. 34, Robey Decl. re Holiday Inn Torrance; Dkt. No. 35, Rowling Decl. re Omni Los Angeles; Dkt. No. 36, Stigter Decl. re Four Seasons; Dkt. No. 38, Zen Decl. re Holiday Inn Torrance.) Notably, none of the declarations provide that, as a result of the Wage Ordinance, any given non-union Hotel Employer will be forced to (*i.e.*, it

will have no other option but to) yield to Local 11's demands for card-check recognition and neutrality agreement.

Plaintiff's biggest concern with the $15.37 per hour minimum wage provision is that it is bad economic policy.[8] There are certainly grounds for this concern. More than one of the City's own economic consultants opined that the $15.37 per hour minimum wage would have detrimental effects on the economy. And, as stated above, the gravamen of the hotel-representative declarations is that implementation of the minimum wage will have damaging effects on the non-union hotels' ability to compete in the marketplace. It takes little effort to realize that this policy discussion is not unique to hotel workers at large hotels in Los Angeles. Nearly every day, the Los Angeles Times and other local and national news outlets are reporting on efforts to implement significant city- and county-wide wage increases for *all* workers, not just hotel workers.[9] On April 14, 2015, hundreds of home health care workers marched through downtown Los Angeles, rallying for a $15 per hour minimum wage.[10] On April 15, 2015, there were wide reports of nearly 1,000 fast-food workers, Wal–Mart employees, and union members in Los Angeles that joined nationwide protests, also calling for a $15 per hour minimum wage.[11] April 15, 2015 also marked the first day of a fifteen-day hunger strike held outside the Los Angeles City Hall designed to pressure City officials into approving a city-wide $15 per hour minimum wage.[12] On May 1, 2015, protesters

8. At the April 6, 2015 hearing, Plaintiffs' counsel conceded the Hotel Associations made (and lost) an economic-policy argument to the legislature.

9. *See, e.g.*, Emily Alpert Reyes, *Three studies of L.A. minimum wage boosts reach different conclusions*, L.A. Times, March 19, 2015, http://www.latimes.com/local/cityhall/la-me-minimum-wage-studies-20150320-story.html; Abby Sewell, *L.A. County supervisors poised to begin weighing minimum wage hike*, L.A. Times, March 23, 2015, http://www.latimes.com/local/countygovernment/la-me-minimum-wage-20150324-story.html; Christopher Thornberg, *Op–Ed: L.A.'s minimum wage plan doesn't make sense*, L.A. Times, March 24, 2015, http://www.latimes.com/opinion/op-ed/la-oe-0325-thornberg-minimum-wage-20150325-story.html; Abbey Sewell, *L.A. County supervisors expected to call for a minimum wage study*, L.A. Times, March 31, 2015, http://www.latimes.com/local/lanow/la-me-ln-county-minimum-wage-20150330-story.html# page=1; Emily Alpert Reyes, *L.A. restaurants push for tips to count toward minimum wage*, L.A. Times, April 19, 2015, http://www.latimes.com/local/cityhall/la-me-tipped-workers-20150420-story.html# page=1; Abby Sewell, *Activists outnumber business owners at L.A. County minimum wage forums*, L.A. Times, April 28, 2015, http://www.latimes.com/local/lanow/la-me-ln-minimum-wage-forum-20150423-

story.html; The Times Editorial Board, *In hiking the minimum wage, don't leave tipped workers behind*, L.A. Times May 3, 2015, http://www.latimes.com/opinion/editorials/la-ed-tipped-minimum-wage-20150503-story.html; Emily Alpert Reyes, *L.A. minimum wage up for discussion; business group says issue rushed*, L.A. Times, May 12, 2015, http://www.latimes.com/local/lanow/la-me-ln-minimum-wage-agenda-20150512-story.html.

10. *See* John Schreiber, *In-home care workers march for $15 hourly wage in L.A. County*, MyNewsLA.com, April 14, 2015, http://mynewsla.com/government/2015/04/14/in-home-care-workers-march-for-15-hourly-wage-in-l-a-county/.

11. *See* Samantha Masunaga, *Nearly 1,000 in L.A. join nationwide protests for $15 minimum wage*, L.A. Times, April 15, 2015, http://www.latimes.com/business/la-fi-fast-food-protests-20150415-story.html.

12. *See* Javier Panzar, *Activists fasting outside L.A. City Hall tell council to hike minimum wage*, L.A. Times, April 21, 2015, http://www.latimes.com/business/la-me-ln-minimum-wage-fast-20150421-story.html; Griselda Nevarez, *Los Angeles Latinas Fast to Raise Minimum Wage*, NBC News, April 29, 2015, http://www.nbcnews.com/ news/latino/wom-

marched through downtown Los Angeles as part of an annual May Day rally, a main theme of which was a $15 per hour minimum wage.[13] The point is this: it is not the role of the courts to interject into matters of legislative economic policy under the guise of NLRA preemption, and Plaintiffs have not met their burden that the Wage Ordinance's $15.37 per hour minimum wage provision is anything but a permissible exercise of the City's power to institute such economic policy.

### e. Plaintiffs' attempt to couch their *Machinists* preemption argument as anything but a facial challenge to the Wage Ordinance fails

 The Hotel Associations argue that this case is distinguishable from *Fortuna* because in *Fortuna* the plaintiff asserted only a *facial* challenge to the AHZE Ordinance and conceded that state minimum labor standards are not subject to preemption; whereas here the Plaintiffs have provided the Court with a detailed factual record and make no "ill-advised concession as to blanket immunity from *Machinists* preemption. . . ." (Reply to City's Opp. at 15 n.7.) The Court does not see the logic in this argument. As an initial matter, the Court does not read *Fortuna* to suggest that the plaintiff made any sort of concession that minimum labor standards have blanket immunity from *Machinists* preemption. More importantly, however, any attempt to distinguish *Fortuna* as a "facial" challenge is a red herring. The nomenclature of a facial challenge—versus an as-applied one—simply implicates the two ways a court may declare a statute unconstitutional, *i.e.*: (1)

the court may declare a statute invalid on its face, such that a state may not enforce it under any circumstance; or (2) the court may find the statute unconstitutional as applied to a particular set of circumstances, allowing the state to enforce the statute in other circumstances. *See generally*, Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 STAN. L. REV. 235, 236 (1994). Here, the Plaintiffs' seek an order enjoining the City from implementing and enforcing the Wage Ordinance under any circumstance, and therefore they indisputably assert a facial challenge against the Wage Ordinance.

That Plaintiffs submitted myriad declarations and other evidence in support of the instant motion. (*see* Dkt. Nos. 24–38) does not change the analysis. To the extent these declarations are relevant to the analysis, they do not speak to the legal issue before the Court. For example, and as discussed above, each of the declarations provide detailed accounts of how implementation of the $15.37 per hour minimum wage will increase salary costs and may require the non-union Hotels to offset those costs—including by passing the costs on to customers through higher prices—in ways that make the non-union Hotels less competitive as compared to neighboring hotels that are either unionized (and therefore eligible for a waiver) or located outside the city limits (and therefore not subject to the Wage Ordinance). As a result, the declarants provide, any given non-union Hotel "could face economic pressure to strike a deal with the Union to obtain a waiver that will allow it to remain competitive in its market." (*See, e.g.*, Dkt No. 29, Hannigan Decl. ¶ 29.)[14] The problem with

en-going-without-meals-raise-minimum-wage-n350271.

**13.** *See* Veronica Rocha, *Thousands to march in May Day rally in downtown L.A.*, L.A. Times, May 1, 2015, http://www.latimes.com/local/lanow/la-me-ln-may-day-20150501-story.html.

**14.** The Court has quoted the declaration of Robert Hannigan, Director of Operations for Hotel Palomar Westwood, only as an example. The other declarations by representatives for non-union Hotels provide similar accounts.

these declarations is that similar statements could be made no matter what the dollar amount of the minimum wage, whether it is $2 per hour or $10 per hour over the current state minimum wage. Thus, the Plaintiffs have not satisfied their burden to show that the "difference in degree" as between the AHZE Ordinance minimum wage and the Wage Ordinance minimum wage amounts to a "difference in kind."

#### f. Local 11's role in lobbying for the passage of the Wage Ordinance does not alter the analysis

The Hotel Associations also attempt to capitalize on *Bragdon*'s warning that employees and unions may "seek to set minimum wage and benefit packages with political bodies," substituting "the free-play of political forces for the free-play of economic forces that was intended by the NLRA." *Bragdon*, 64 F.3d at 504 (9th Cir.1995). (*See* Reply to Local 11's Opp. at 8.) Plaintiffs make much of the fact that Local 11 lobbied the City Council in passing the Wage Ordinance, and that the Hotel Associations (and other third parties with aligned interests) were not given equal access during the legislative process. (*See, e.g.,* Mot. at 4.) To support their argument that Local 11's lobbying efforts are relevant to the preemption analysis, Plaintiffs direct the Court to the dissent in *Chamber of Commerce of U.S. v. Lockyer*

("*Lockyer*"), 463 F.3d 1076, 1098 (9th Cir. 2006) *rev'd sub nom. Chamber of Commerce of U.S. v. Brown,* 554 U.S. 60, 128 S.Ct. 2408, 171 L.Ed.2d 264 (2008). The Ninth Circuit's *Lockyer* dissent suggested that the entire assembly bill at issue (AB 1889) was preempted because it was "sponsored by the California Labor Federation, ALF–CIO, and supported by a phalanx of labor unions." *Id.* at 1102 (Beezer, J. dissenting). Plaintiff's reliance on the *Lockyer* dissent is misplaced for at least three reasons. First (and most obviously), the *Lockyer* dissent is just that, a dissent, and therefore it is not now, and never has been, controlling authority on this Court. Second, as the Ninth Circuit's *Lockyer* majority pointed out, evidence of union sponsorship is an "irrelevant" consideration because it is "not up to [the courts] to impugn the California's legislature's motives." *Id.* at 1097 n. 21; *see also Livadas,* 512 U.S. at 120, 114 S.Ct. 2068 (citing *Golden State Transit Corp.,* 475 U.S. at 613, 106 S.Ct. 1395 (noting that the City's desire to remain "neutral" in labor dispute does not determine pre-emption)).[15] The *Lockyer* majority, thus, is consistent with Plaintiffs' own position that NLRA preemption is determined by an analysis of the "actual content of [the ordinance] and its real effects on federal rights," (Mot. at 10 (quoting *Brown,* 554 U.S. at 69, 128 S.Ct. 2408)), as opposed to any interest-

---

15. The Court recognizes that Plaintiffs cite *Golden State* for the opposite point, *i.e.*, that legislative motive is in fact relevant to the preemption analysis. (*See* Reply to City's Opp. at 19.) Plaintiffs' reliance on *Golden State* for this proposition is misplaced. At issue in *Golden State* was not the legislature's motive in passing an otherwise facially neutral ordinance (as is the case here) but rather the undisputed fact that the City explicitly conditioned the renewal of a taxi cab franchise agreement on the employer settling a labor dispute with its union. The Supreme Court held that the City's threat to withhold the franchise renewal absent a resolution of

the labor dispute encroached on the employer's "essential weapon of economic strength—the ability to wait out the strike.'" *Golden State Transit Corp.,* 475 U.S. at 611–12, 106 S.Ct. 1395; *see also id.* at 615, 106 S.Ct. 1395 (explaining that both parties were permissibly using economic weapons as a legitimate part of their collective-bargaining process—*e.g.,* the union striking at a time the City was considering the franchise renewal, and the employer waiting out the strike in an attempt to obtain bargaining concessions—but that the bargaining process was "thwarted when the city in effect imposed a positive durational limit to the exercise of economic self-help").

group lobbying efforts and/or the legislature's apparent motive in passing the ordinance. Finally, though the Supreme Court reversed the Ninth Circuit *Lockyer* majority—in effect agreeing with the general conclusion of the Ninth Circuit *Lockyer* dissent that the two statutory provisions were preempted—the Supreme Court's reasoning for doing so had nothing to do with the union's lobbying efforts in passing AB 1889 (these efforts were not mentioned at all in the opinion). Plaintiff's attempt to use the *Lockyer* dissent as persuasive authority that Local 11's lobbying efforts are somehow relevant to the preemption analysis falls short.

Accordingly, because Plaintiffs have not satisfied their burden that the $15.37 per hour minimum wage is anything but a valid exercise of the City's police power, the substantive dollar amount of the minimum wage provision, on its face, does not support a finding of *Machinists* preemption.

### 4. Failure to distinguish between tipped and non-tipped employees

In conjunction with their arguments regarding the Wage Ordinance's $15.37 per hour minimum wage, Plaintiffs make much of the fact that the ordinance fails to distinguish between tipped and non-tipped employees and does not permit Hotel Employers to include gratuities or Service Charges to the minimum wage calculation. (Mot. at 5, 14 (citing Dkt. No. 29, Hannigan Decl. ¶¶ 16–22; Dkt No. 35, Rowling Decl. ¶¶ 21–22.) Plaintiffs state that typically in the hotel industry (and presumably in other service industries), tipped employees receive lower hourly wages because, as a result of their tips, they are often the highest paid employees at hotels. In order to maintain this pay structure once the Wage Ordinance goes into effect, Hotel Employers may have to raise non-tipped employees' hourly wages significantly higher than the $15.37 per hour minimum wage, which in turn will result in "exceedingly costly compensation schemes inconsistent with hotel economies." (Mot. at 14.)

The response to this argument is simple. The California Labor Code *prohibits* the state and municipalities from establishing minimum wages that distinguish between tipped and non-tipped workers. Cal. Labor Code § 351; *see also Henning v. Industrial Welfare Commission*, 46 Cal.3d 1262, 1279, 252 Cal.Rptr. 278, 762 P.2d 442 (1988) (holding that a two-tier minimum wage provision is invalid because it "purports to allow an employer to pay a tipped employee a wage lower than he would be obligated to pay if the employee did not receive tips"). Plaintiffs do not dispute that California law prohibits the City from making such a distinction in setting minimum wages. Thus, Plaintiffs' argument here is really a nuanced version of Plaintiffs' argument discussed above, *i.e.*, that the dollar amount of the $15.37 per hour minimum wage is so onerous that it is not the type of minimum labor standard contemplated by *Metropolitan Life* and *Fort Halifax*. For the reasons articulated above (the Court will not repeat them here), this argument is without merit.

### 5. Waiver provision

The Hotel Associations next argue that giving unions the "exclusive" power to grant waivers of the Wage Ordinance's terms disrupts the balance of power between labor and management because it gives unions an "economic weapon" that the union would not otherwise have. (Mot. at 14.) The Hotel Associations further argue that because the ordinance does not automatically exempt hotels with collective bargaining agreements but instead requires parties to renegotiate their existing agreements to include the waiver, the ordi-

nance amounts to government "meddling" in collective bargaining. (*Id.*)

Plaintiffs' arguments regarding the waiver provision fall short. Exemptions for collective bargaining agreements with respect to any minimum labor standard are par for the course, as they are nearly guaranteed to be present in any labor-related statute. Plaintiffs' counsel conceded as much at the April 6, 2015 hearing. The Supreme Court has made clear that the NLRA "cast[s] no doubt on the validity of these familiar and narrowly drawn opt-out provisions." *Livadas,* 512 U.S. at 132, 114 S.Ct. 2068. It is simply "[not] plausible to suggest that Congress meant to pre-empt such opt-out laws as 'burdening' the statutory right of employees not to join unions by denying nonrepresented employees the 'benefit' of being able to 'contract out' of such standards. *Id.* at 132 n. 26, 114 S.Ct. 2068; *see also Babler Bros., Inc. v. Roberts,* 995 F.2d 911, 915 (9th Cir.1993) (applying the reasoning in *Fort Halifax* to find that a statute was not preempted where it exempted union employers from paying overtime wages). Further, the Ninth Circuit has rejected the argument that a collective bargaining agreement waiver is preempted simply because it may incentivize non-union employers to unionize. *See Viceroy Gold Corp. v. Aubry,* 75 F.3d 482 (9th Cir.1996).

At issue in *Viceroy* was California Labor Code § 750 *et seq.,* which set a maximum workday of eight hours for persons engaged in mining and smelting, unless the workers were covered by a valid collective bargaining agreement that "expressly provides for the wages, hours of work, and working conditions of the employees." *Id.* at 486. The employer, which operated a non-union facility, argued that the labor code was preempted because it put the facility "at a competitive disadvantage relative to union mines and that 'operational efficiency, safety and employee morale are

all adversely impacted" by the interpretation and enforcement of the statute." *Id.* The district court found that the opt-out provision was preempted under *Machinists* because "[a]ny attempt to characterize the eight-hour shift limitation as a 'minimum-benefit' for mine workers is disingenuous in light of the overwhelming evidence that the prohibition is highly onerous to [non-union] employees and employers of the mining industry." *Id.* at 489. The Ninth Circuit reversed, holding that while the eight-hour work day requirement may be "burdensome," the statute "undoubtedly provides some minimum protection to non-union mine workers, while permitting a longer work day through the protections provided by the collective bargaining or the [union] election process...." *Id.* at 489–90.

The Hotel Associations attempt to distinguish *Viceroy* on the grounds that California Labor Code § 750 does not require the waiver to be "clear and unambiguous" like the Wage Ordinance at issue here; and that the *Viceroy* opt-out provision was not exclusive to collective bargaining agreements, as it allowed employees to waive the labor code requirements if a two-thirds majority of the affected employees of a particular employer voted to adopt an alternative policy (subject to certain restrictions). (*See* Reply to City Opp. at 17 n.10; Reply to Local 11 Opp. at 7.) Plaintiffs' arguments are not persuasive. The Supreme Court has already held that collective bargaining agreement waivers need to be "clear and unmistakable" to be given effect. *See Livadas,* 512 U.S. at 125, 114 S.Ct. 2068. And this makes perfect sense. The right to $15.37 per hour minimum wage belongs to the affected hotel workers. Thus, because California law requires that "the valid waiver of a right presupposes an actual and demonstrable knowledge of the very right being waived,"

*Jones v. Brown,* 13 Cal.App.3d 513, 519, 89 Cal.Rptr. 651 (1970), the Wage Ordinance's requirement of a "clear and unambiguous" waiver is unremarkable. That non-union Hotel Workers cannot waive the provisions of the Wage Ordinance—as could the employees subject to California Labor Code § 750 in *Viceroy*—is likewise unremarkable: a minimum wage is categorically different than an hours-per-day maximum imposed for safety reasons, and the City has deemed that waiver of the rights by any Hotel Worker *not* covered by a collective bargaining agreement "shall be deemed contrary to public policy and shall be void and unenforceable." (WO at 8.) Again, this makes sense. Both California statute and case law recognize that the rights to minimum wage and overtime payments are not waivable. *See* Cal. Labor Code § 1194; *Gentry v. Superior Court,* 42 Cal.4th 443, 455, 64 Cal.Rptr.3d 773, 165 P.3d 556 (2007). While "[a]nyone may waive the advantage of a law intended solely for his benefit ... a law established for a public reason cannot be contravened by a private agreement." *Sonic–Calabasas A, Inc. v. Moreno,* 51 Cal.4th 659, 679, 121 Cal.Rptr.3d 58, 247 P.3d 130 (2011) (internal quotation marks omitted).

■ Plaintiffs' argument that the waiver provision gives unions an "economic weapon" that it would not otherwise have is equally unpersuasive. As Local 11 pointed out at the April 6, 2015 hearing, there is no evidence before the Court with respect to which party (the employer or the union) has the upper hand in bargaining power. California has enacted a vast array of regulations governing labor standards that form the "backdrop" of employee and employer state law labor rights. Some of these regulations ostensibly favor employers. For example, California law presumes all employees are at-will employees absent contract terms specifying otherwise. *Guz v. Bechtel Nat. Inc.,* 24 Cal.4th 317, 335, 100 Cal.Rptr.2d 352, 8

P.3d 1089 (2000) (citing Cal. Labor Code § 2922) ("An at-will employment may be ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice."). Typically, collective bargaining agreements contract around California's at-will employment policy and contain for-cause termination clauses. Plaintiffs' argument with respect to the waiver provision is akin to a union arguing that California's at-will employment policy (or any other seemingly pro-employer regulation) is subject to *Machinists* preemption because it provides employers with an economic weapon for which it might otherwise have to bargain. The Court assumes no party to this litigation would suggest that to be the case. Thus—reminding Plaintiffs that "*any* state [or local] law that substantively regulates employment conditions" gives one party or the other something for which it otherwise might have to bargain, *Fort Halifax,* 482 U.S. at 21, 107 S.Ct. 2211 (emphasis added)—the Court finds that the Wage Ordinance's waiver provision and its effects are consistent with the NLRA's legislative goals and purposes and do not implicate *Machinists* preemption.

### 6. Ban on unilateral implementation

The Hotel Associations' waiver arguments are part and parcel of their arguments regarding the so-called ban on unilateral implementation. To review, the Wage Ordinance provides that "[u]nilateral implementation of terms and conditions of employment by either party to a collective bargaining relationship shall not constitute or be permitted as a waiver of all or any part of the provisions of this article." (WO at 8.) The Hotel Associations argue that this provision provides an independent basis for preemption because unilateral implementation is "an integral part of the bargaining process" in labor management relations, and requiring hotels to

implement statutory minimums during negotiations would interfere with collective bargaining as it typically occurs upon expiration of the CBA. (Mot. at 17.)

Plaintiffs rely on *Barnes v. Stone Container Corporation*, 942 F.2d 689 (9th Cir. 1991) to support their argument. (*See* Mot. at 19.) In *Barnes*, the collective bargaining agreement between Barnes' employer and his union had expired. After several months of unsuccessful negotiations, the parties reached an impasse. Following the expiration of the collective bargaining agreement but before the parties reached an impasse, the employer fired Barnes for harassment after he sprayed two replacement employees with water when they crossed the picket line. The union filed an unfair labor practice charge on Barnes' behalf, asserting that the stated reason for his discharge was pretextual and that the employer fired him for his union activity. The NLRB investigated and found no basis for the retaliation charge, and the union withdrew the complaint. Barnes then filed a state law action under the Montana wrongful discharge act ("WDA"), which provides that an employee discharge is "wrongful" if the termination is not for "good cause," except when the employee is covered by a collective bargaining agreement. The employer moved for summary judgment, arguing that Barnes' wrongful discharge lawsuit was preempted under *Machinists* because it "would impose a just cause term where one did not exist (*i.e.*, under the expired CBA), thus affecting the relations between employer and its represented employees after contract-termination and prior to impasse," a time period during which "the NLRA contemplates relations free of state interference." *Id.* at 691. The district court denied summary judgment, but the Ninth Circuit—relying on a Second Circuit case, *Derrico v. Sheehan Emergency Hosp.*, 844 F.2d 22 (2d Cir.1988)—reversed.

In *Derrico*, the plaintiff—who was also discharged after expiration of the collective bargaining agreement but before the union and employer had bargained to impasse—filed a state court action, alleging that he had been fired without just cause. His theory was that the expired bargaining agreement contained a just cause provision which, after contract expiration and prior to impasse, resulted in an implied contract between each union employee and the employer that there would be no discharge without cause. The Second Circuit affirmed the district court's dismissal of the plaintiff's case under *Machinists*, explaining that the theory of an implied contract resulting from an expired collective bargaining agreement created "substantial potential for friction" with the "delicate machinery of the NLRA," and permitting the plaintiff's lawsuit would "artificially limit" the parties' post-expiration options. *Id.* at 28. The Second Circuit explained:

When bargaining alone does not produce consensus, the NLRA contemplates that both sides will resort to "economic weapons." Such resort is an integral part of the balance the NLRA strikes between labor and management. The possibility that a term of an expired CBA might become an "implied" contract under state law would tie the parties' hands in a manner inimical to this facet of the NLRA's collective bargaining process. Exposure to liability at state law for breach of contract under circumstances of this case would significantly alter the labor-management relationship that follows expiration of a CBA. [The plaintiff's] theory would [also] significantly affect the collective bargaining process that lies at the heart of the NLRA. Expiration of a CBA plainly works a significant change in the parties' relationship. Just as plainly, the prospect of that change and the mutual awareness of the tactics to which either side may thereafter resort provide the parties

with incentives to negotiate. To allow a CBA provision to linger on after the contract's expiration in the form of an implied contract would dilute these effects.

*Id.* at 29 (internal citations omitted).

Relying on the Second Circuit's reasoning in *Derrico*, the Ninth Circuit panel in *Barnes* found that the plaintiff's state law wrongful discharge lawsuit was preempted under *Machinists*:

> [T]he incidental effect of allowing Barnes to pursue his WDA action after contract expiration, but prior to a bargaining impasse, is precisely the sort of entanglement the Supreme Court sought to avoid in *Machinists*. Permitting WDA actions during this period would have the untoward effect of imposing a contract term on the parties and thus altering incentives to negotiate.... We believe [the *Derrico* ] reasoning applies as well to a term imposed by a state statute as it does to a term implied via contract theory derived from case law. Unlike the unemployment compensation in *New York Telephone* [16] and the health benefits in *Metropolitan Life*, we view the imposition of a just cause term by the WDA on the parties negotiating a contract as meddling at the heart of the employer-employee relationship at a time when such interference is most harmful. Issues of hiring and firing are often central to CBA negotiations and the NLRA, as interpreted in *Machinists*, intended to allow the parties to

resolve these matters without the unsettling effect of state regulation.

*Id.* at 693.

There are two unique aspects of *Barnes* that render its reasoning inapplicable to the facts in this case. First, the Ninth Circuit acknowledged that the Montana WDA is a substantive minimum labor standard different in kind than the minimum labor standards at issue in, for example, *Metropolitan Life* and *Fort Halifax*,[17] because "[i]ssues of hiring and firing are often central to CBA negotiations and the NLRA, as interpreted in *Machinists*, intended to allow the parties to resolve these matters without the unsettling effect of state regulation." *Id.* at 693. Second, and more importantly, *Barnes* makes clear that this preemption scenario is limited to a narrow set of circumstances, *i.e.*, the sensitive time period between post-expiration and pre-impasse negotiations. *Id.*; *see also National Broadcasting Co., Inc. v. Bradshaw* *("NBC")*, 70 F.3d 69, 73 (9th Cir. 1995) (explaining that because a state statutory remedy was not invoked until after bargaining impasse was reached, "the type of interference with negotiations frowned upon in *Barnes* did not occur"). In this regard, *Barnes* involves the preemption of an individual lawsuit under a particular set of circumstances.[18] It has nothing to do with whether—post-expiration of a collective bargaining agreement—the NLRA prohibits employers from implementing statutory minimums during negotiations;[19] and it certainly does not support the Plain-

---

**16.** *See New York Tel. Co. v. New York State Dep't of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553, 540446 (1979) (holding that the NLRA does not preempt a state law providing unemployment benefits to striking workers).

**17.** The Ninth Circuit acknowledged this distinction in the context of affirming the principles of *Metropolitan Life*. *See Barnes*, 942 F.2d at 693 ("The policies underlying the NLRA, restoration of equality of bargaining

power and encouragement of collective bargaining, are not affected by the kind of the minimum standards contained in the Massachusetts law [at issue in *Metropolitan Life* ].").

**18.** Notably, *Barnes* involved what would appropriately be referred to as an "as applied" challenge to the Montana WDA.

**19.** The Ninth Circuit has since held that it is entirely permissible (and not preempted un-

tiffs' contention that the entire Wage Ordinance is preempted simply because, hypothetically, a hotel worker might, at some indefinite point in the future, bring a private enforcement action under the Wage Ordinance under the narrow circumstances at issue in *Barnes*.

Plaintiffs reliance on *Brown v. Pro Football, Inc. ("Pro Football")*, 518 U.S. 231, 116 S.Ct. 2116, 135 L.Ed.2d 521 (1996) (*see* Mot. at 19–20), does not change the analysis. *Pro Football* involved the extent to which the non-statutory labor exemption to antitrust laws shielded the National Football League ("NFL") club owners' unilateral implementation of new salary caps ($1,000 per week) for developmental squad players after the league's collective bargaining agreement with the players union had expired and negotiations had reached an impasse. It was undisputed that the club owners' unilateral implementation—absent the labor exemption—would have constituted an unlawful restraint of trade. In holding that the exemption applied to the club owners' conduct at issue in the case—*i.e.*, their post-impasse imposition of a proposed employment term concerning a mandatory subject of bargaining—the Supreme Court explained that "[a]s a matter of logic, it would be difficult, if not impossible, to require groups of employers and employees to bargain together, but at the same time to forbid them to make among themselves or with each other *any* of the competition-restricting agreements poten-

tially necessary to make the process work or its results mutually acceptable." *Id.* at 237, 116 S.Ct. 2116 (emphasis in original); *see id.* at 242, 116 S.Ct. 2116 ("All this is to say that to permit antitrust liability here threatens to introduce instability and uncertainty into the collective-bargaining process, for antitrust law often forbids or discourages the kind of joint discussions and behavior that the collective-bargaining process invites or requires.").[20] While *Pro Football* had nothing to do with *Machinists* preemption, the players union argued that the exemption should not apply in this context because antitrust laws are akin to "general 'backdrop' statutes," such as the statutes involved in *Metropolitan Life* and *Fort Halifax*, which apply in the absence of an effective collective bargaining agreement. *Id.* at 248, 116 S.Ct. 2116. The Supreme Court rejected this argument, explaining that the minimum labor standard statutes, like the ones at issue in *Metropolitan Life* and *Fort Halifax*, were categorically distinct from federal antitrust laws because they "neither encouraged nor discouraged the collective-bargaining process that are the subject of the federal labor laws," and they do not "come accompanied with antitrust's labor-related history." *Id.* (internal quotation marks and alterations omitted). It would be a different story had the *Pro Football* club owners unilaterally implemented a weekly salary cap less than any of the applicable state minimum wages.[21] Absent that, however, *Pro Foot-*

---

der the NLRA) for an employer to be liable for the difference between a higher statutory minimum wage rate and a lower negotiated rate during the interim period between effective collective bargaining agreements when the subsequent agreement is not retroactive to cover the gap period. *See NBC*, 70 F.3d at 71–72 (holding that a state cannot "withhold its minimum benefit protections from employees solely on the ground that they were bound by a collective bargaining agreement," and union employees are allowed "the full protec-

tion of the minimum standard, absent any agreement for something different").

**20.** *Pro Football* provides a detailed and comprehensive analysis of the many nuanced issues at the intersection of federal antitrust and labor laws, particularly with respect to multi-employer collective bargaining. For the most part, the analysis is not relevant to the issues in this case, and therefore the Court does not discuss it here.

**21.** The Court surmises that when *Pro Football* was decided in 1996, $1,000 per week (rough-

*ball* has no application to this case, and Plaintiffs have failed to establish that the Wage Ordinance's ban on unilateral implementation is inconsistent with the NLRA's legislative goals and purposes.

### 7. Pressure to engage in neutrality/card check agreements

The Hotel Associations finally argue that because (1) non-union Hotels must enter into collective bargaining agreements as a statutory predicate to receive a waiver, and (2) Local 11 is the only union for hotel workers in Los Angeles and organizes exclusively through card-check/neutrality agreements, then Hotel Employers are effectively required to acquiesce to Local 11's neutrality demand to be eligible for a waiver. Thus, the Plaintiffs argue, "the City has doubly rejiggered the economic calculus as to whether or not to acquiesce to the Union's demand for card-check recognition," which in turn compels *Machinists* preemption. (Mot. at 12–14; Reply to City's Opp. at 11.) This argument is not persuasive.

As discussed in detail above, the Wage Ordinance's minimum wage and waiver provisions do not interfere with collective bargaining and labor relations, and they do not otherwise conflict with the NLRA's legislative goals and purposes. Nothing in the Wage Ordinance requires any Hotel Employer to unionize, enter into a card-check/neutrality agreement,[22] or forego any rights to which it is otherwise entitled under federal labor law. The Wage Ordinance is completely silent on these issues. Simply because the Wage Ordinance may have "rejiggered" the economic calculus—again, this would be the case for any

change in any substantive minimum labor standard—that does not compel preemption.

### C. Absent a Showing of Success on the Merits, Plaintiffs Cannot Establish Irreparable Harm or That The Balance of Hardships Tip In Plaintiffs' Favor

In summary, the Plaintiffs have failed to show any likelihood of success on the merits. As stated at the beginning of this analysis, the whole of the Wage Ordinance is no greater than the sum of its parts. On its face, the Wage Ordinance is a minimum labor standard that neither encourages nor discourages collective bargaining. The minimum wage provision operates simply as part of the backdrop for collective bargaining negotiations—to the extent the parties opt to partake in such negotiations—and it is otherwise part of the minimum labor standard landscape that provides state law rights that the parties enjoy without having to bargain for them. Nothing about the waiver provision (including the ban on unilateral implementation) warrants preemption: the Supreme Court and Ninth Circuit have held that such opt-out provisions are valid and that union employees are entitled to the full protections of minimum standards absent a valid collective bargaining agreement for something different, including during any gap periods between such agreements.

Because Plaintiffs have not shown any likelihood of success on the merits, they cannot make the necessary showing of irreparable harm. Thus, under any version of the sliding scale approach, Plaintiffs have not satisfied their high burden for the

---

ly $25 per hour for a 40–hour work week) was well above each of the applicable then-state minimum wages.

**22.** While, currently, Local 11 is the only union representing hotel workers in the Los

Angeles area, there is nothing preventing another union—one that does not organize exclusively vis-à-vis card-check/neutrality agreement—from organizing hotel workers at any given hotel in the City in the future.

extraordinary and drastic remedy that is a preliminary injunction.

## IV. CONCLUSION

Plaintiffs seek a preliminary injunction staying the effective date and enjoining enforcement of the City's Wage Ordinance, mandating a $15.37 per hour minimum wage for Hotel Workers at large Hotels in Los Angeles, which is scheduled to go into effect on July 1, 2015. Plaintiffs argue that the Wage Ordinance is preempted under the NLRA. A review of Plaintiffs' arguments and evidence, however, make clear that Plaintiffs' biggest concern with the Wage Ordinance is that it is bad economic policy. However, it is not the role of the Court to interject into matters of legislative economic policy under the guise of NLRA preemption. When Plaintiffs' arguments and evidence are considered against the backdrop of the NLRA preemption legal standard, Plaintiffs have not satisfied their high burden for the extraordinary and drastic remedy of preliminary injunctive relief.

*Metropolitan Life* and its progeny provide that, under *Machinists* preemption, minimum labor standards are presumptively valid, so long as they are laws of general applicability and neither encourage nor discourage collective bargaining or self-organizing. While the Ninth Circuit has recognized that in an extreme case, the substantive requirements of a minimum labor standard could be so restrictive as to virtually dictate the results of the collective bargaining and self-organizing process, this occurs only where one or both parties are deprived of a meaningful choice as between complying with the substantive requirements and entering into a collective bargaining agreement. Here, Plaintiffs have failed to meet their burden that the Wage Ordinance's $15.37 per hour minimum wage is so onerous that it is economically unfeasible and therefore forces the hand of non-union hotels to unionize.

Plaintiffs' own evidence establishes that Hotel Employers have a meaningful choice as between paying the $15.37 per hour minimum wage and entering into collective bargaining agreements, and so the Wage Ordinance's minimum wage provision does not compel preemption. Similarly, Plaintiffs have failed to meet their burden that the Wage Ordinance's waiver provision interferes with collective bargaining and labor relations or is otherwise inconsistent with the NLRA's legislative goals and purposes. Union opt-out provisions are also presumptively valid, and union employees are entitled to the full protections of minimum labor standards absent a collective bargaining agreement for something different, including during any gap periods between such agreements. Accordingly, the Hotel Associations have failed to show any likelihood of success on the merits of their NLRA preemption claim, and their motion for a preliminary injunction staying the effective date and enjoining enforcement of the Wage Ordinance is **DENIED**. (Dkt. No. 23.)

The City's motion to strike (Dkt. No. 62) is **DENIED** as moot, as it is duplicative in substance to the City's separately filed objections.